Filed 6/24/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.D.,<br><br>        Defendant and Appellant. | A155254<br><br>(Contra Costa County Super. Ct. No. J1600108) |
| In re B.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>G.D.,<br><br>        Defendant and Appellant. | A155571<br><br>(Contra Costa County Super. Ct. No. J1600108) |

THE COURT:

It is ordered that the opinion filed herein on May 24, 2019, be modified as follows:

1

1.    In the first sentence of the first paragraph that continues in mid-sentence at the top of page 3, the language reading "Minor was likely to be adopted by Foster Parents J.M. and C.P." shall be deleted and replaced with "Minor was likely to be adopted by foster parents J.M. and C.P. (collectively, Foster Parents)";

2.    In the first sentence of the first full paragraph on page 8, the language reading "Minor was adoptable by foster parents J.M. and C.P (collectively, Foster Parents)" shall be deleted and replaced with "Minor was adoptable by Foster Parents";

3.    In the first sentence of footnote 8 on page 14, the language "Having granted Mother's C.C.P. section 909 motion, we" shall be deleted and replaced with "We therefore".

The modifications effect no change in the judgment.

Dated:  June 24, 2019         _____ Acting P. J.

A155254, A155571/*In re B.D.*

A155254, A155571/In re B.D.

Trial Court:                                    Contra Costa County Superior Court

Trial Judge:                                    Hon. Rebecca C. Hardie

Counsel:

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and
    Appellant J.D.

First District Appellate Project, Jonathan Soglin and Louise E. Collari, under
    appointment by the Court of Appeal, for Defendant and Appellant G.D.

Sharon L. Anderson, County Counsel, Lisa M. O'Connor, Deputy County Counsel for
    Plaintiff and Respondent.

Leslie A. Barry, under appointment by the Court of Appeal, for Minor.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Plaintiff and Respondent, v. J.D., Defendant and Appellant. | A155254 (Contra Costa County Super. Ct. No. J1600108) |
| In re B.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Plaintiff and Respondent, v. G.D., Defendant and Appellant. | A155571 (Contra Costa County Super. Ct. No. J1600108) |

## I. INTRODUCTION

In these consolidated appeals, G.D. (Mother) and J.D. (Father) (collectively, Parents) appeal from an order and findings entered at a Welfare and Institutions Code[1]

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

section 366.26 hearing (.26 hearing) terminating their parental rights to eight-year-old B.D. (Minor), adopting a permanent plan of adoption, and determining that Parents failed to meet their burden of establishing the applicability of the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i).  Also before us are two motions, one from Mother asking us to take additional evidence on appeal pursuant to Code of Civil Procedure section 909 (C.C.P. section 909 motion), and one from the Contra Costa Children and Family Services Bureau (Bureau) asking us to strike Mother's C.C.P. section 909 motion.  After the appeals and the accompanying motions were fully briefed, the parties stipulated to reversal, jointly recognizing that, following the termination of parental rights, "subsequent events [have] undermined the juvenile court's finding that [Minor] was likely to be adopted."

We grant Mother's C.C.P. section 909 motion, deny the Bureau's motion to strike, and reverse, holding as follows.  First, this is one of those "rare and compelling case[s]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 399 (*Zeth S*.)) "where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much[.]"  (*Id.* at p. 413, fn. 11.)  Second, although the parties stipulate to reversal under Code of Civil Procedure section 128, subdivision (a)(8), we decline to reverse on that basis.  Because summary reversal by agreement of the parties would mask an error of federal constitutional magnitude that warrants attention in a reasoned opinion, we decide the case on the merits.  Third, the Bureau violated section 366.22, subdivision (c)(1)(D), by withholding from the court information material to the "preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, particularly the caretaker[.]"  We conclude that, for Minor—who has joined Mother and Father in requesting reversal—this breach rises to the level of a due process violation.  We therefore will remand with directions that the juvenile court conduct a new .26 hearing.

## II.    BACKGROUND

Barely a month after juvenile court Judge Rebecca Hardie permanently severed the relationship between Minor and Parents in reliance on the Bureau's recommended

finding that Minor was likely to be adopted by Foster Parents J.M. and C.P.—in whose care the Bureau had consistently reported he was happy and thriving—Minor was removed from Foster Parents' home. During a neglect investigation concerning another foster child in the home, the Bureau discovered that Minor had recently suffered physical abuse. An investigator saw a bruise on Minor's lip, and upon inquiry, learned that it had been caused when J.M. threw an eraser at him, striking him hard enough to draw blood. J.M.'s explanation of the incident was implausible, and Minor's absence from school that day suggested that Foster Parents kept him home to hide the injury.

But that was only a hint of things to come. In the course of a series of hearings on Foster Parents' objection to Minor's detention, Judge Hardie learned that, in June 2017, more than a year earlier, the Bureau had conducted a prior investigation of possible sexual abuse of Minor in Foster Parents' home (June 2017 Investigation), yet had failed to disclose it to her prior to the .26 hearing. The social worker assigned to Minor's case at the time of both investigations testified that no sexual abuse of Minor was ever confirmed, and that the basis for the June 2017 Investigation—a report "from someone who knew [J.M.] from the past" alleging that he was a convicted rapist—was never substantiated. When she prepared the required section 366.26 report (.26 Report),[2] the social worker testified, the Bureau had concluded there was "no danger" to Minor in Foster Parents' home and she considered the 2017 allegation of sexual abuse to be "old news."

According to the social worker, she never received a copy of the investigator's report and was told only that the investigation ended inconclusively. Beyond that, all she knew about the inquiry was the end result: A safety plan was put in place designating C.P. as the sole caregiver authorized to be alone in the home with Minor. When pressed about why she never mentioned anything in the .26 Report about the June 2017 Investigation of possible abuse of minor in Foster Parents' home or the safety plan, the

_____

[2] (See § 366.22, subd. (c)(1).) When we refer to the .26 Report, we mean the .26 Report as originally filed in this case on May 9, 2018 and as updated in an Addendum filed on August 8, 2018, the day of the .26 hearing.

3

social worker testified that she had produced her case notes to all parties in discovery, and that those case notes referenced both the investigation and the safety plan.

But never mentioned in the case notes or in the .26 Report was evidence of the following, based on detailed interview summaries in the Penal Code section 11166 investigation report that the Bureau prepared in 2017 (2017 Investigation Report)[3]: (1) J.M. had spent seven years in state prison for a home invasion burglary; (2) J.M. has three adult sons, J.M. Jr., N.M., and T.M., and as juveniles the sons had not only been victims of sexual abuse, but each was alleged to have committed sexual offenses against other juveniles; (3) all three were declared to be wards and placed in a group home for rehabilitation; (4) according to Minor, at least one of the three sons, T.M., was living in Foster Parents' home while Minor was in their care; and (5) R.S., J.M.'s adult nephew, had been sharing a bedroom with Minor.[4]  Additional details emerged in the testimony, including the fact that while he was incarcerated, J.M.'s parental rights to his sons were terminated.  In addition, the social worker admitted that, going as far back as 2016, she was aware of J.M.'s criminal and child welfare history, but saw no need to mention these things because J.M. and C.P. were licensed foster care providers.

---

[3] The Bureau lodged the 2017 Investigation Report with Judge Hardie at an October 19, 2018 hearing and, when the social worker testified on October 31, 2018, she brought with her and provided to Judge Hardie copies of excerpts of her case notes referring to the June 2017 Investigation.  Thus, the court had before it detailed investigative information generated by the June 2017 Investigation as well as copies of the 2017 case notes that the social worker testified she produced in discovery.

[4] Because of the many indications that individuals who were either sex offenders or had been victims of sex offenses were or may have been spending time around Minor while J.M. and C.P. were caring for him, the composition of the residents in Foster Parents' home was a major focus of the June 2017 Investigation.  To address concerns raised by the issue of who, exactly, was living in Foster Parents' home and the sleeping arrangements there, the safety plan implemented for Foster Parents in 2017 required them to commit that they would not allow any other adult besides themselves, or anyone who was not specifically designated in their Resource Family Approval certificate, to live in their home, and prohibited Minor from sharing a bedroom with any adult.  The safety plan also designated C.P. as the "responsible party" to provide care and supervision of Minor.

At the hearing on October 19, 2018, Judge Hardie reviewed a summary memo from the Bureau describing the June 2017 Investigation, along with copies of detailed investigative narratives and juvenile delinquency records relating to J.M.'s three sons. She was furious, and let it be known: "I have to say folks, that I am truly shocked by what [is] set forth in this memo for today, and, quite frankly, . . . there's going to be some followup proceedings with the [Bureau] for the failure to advise the Court and Counsel of the prior investigation prior to termination of parental rights. [¶] It's in my view unconscionable that that information was not provided to the Court and to Counsel." Judge Hardie asked for the identities of every individual at the Bureau all the way up the supervisory chain above the social worker on Minor's case, continued the hearing, and directed that "I'd like all those individuals and representatives present in court at the next hearing."

Extensive testimony taken at hearings on October 31 and December 5, 2018 confirmed that, as of September 2018, Foster Parents were not only violating their safety plan—and thus putting Minor at risk of sexual abuse—but also that physical abuse of him by others in the home had been ongoing for some time. Judge Hardie summed up her evaluation of the situation as follows: "I proceeded in [Minor's] case with termination of parental rights because he was in a home with committed caregivers who wanted to adopt him. . . . [¶] . . . [¶] [But] in looking at the whole picture [now], . . . it is very concerning to me . . . [¶] It's clear to me that both [C.P.] and [J.M.] were well aware of the sexually acting out behaviors of the three, now young men, boys at the time, and yet permitted them to be in the household. It's also concerning to me that . . . [the nephew, R.S.,] was allowed to share the room with [Minor], because [R.S.] says he was sexually abused as a child. . . . [¶] If you look at [Minor's] reports, he also goes on to say that he was hit by several people in the household and he was afraid of them."

The Bureau apologized and accepted responsibility for the incomplete .26 Report, explaining to Judge Hardie that its "normal practice" for inquiring into allegations of abuse in an out-of-home foster placement was to keep the confidential investigative material siloed within the investigatory unit so as not to "cross-contaminate" the foster

5

placement—a policy it acknowledged was flawed, as evidenced here, because the investigation report itself "was never given to the case carrying social worker or supervisor." The Bureau offered reassurances that this policy was being changed, that there would be specific instructions that social workers must include in .26 reports going forward any reports of prior abuse investigations concerning prospective adoptive parents, and that the situation here would never occur again.

Ultimately, Judge Hardie accepted the Bureau's explanation of what happened, but she did not mince words about the situation in which it placed the court. The June 2017 Investigation "should have been reported to the Court and it should have been reported to minor's counsel," she said. "[P]eople wonder why there are headlines about the foster care system and about judges who make decisions and child welfare services. This is fuel for the fire. . . . [A] judge cannot make smart, appropriate orders and decisions about a child's care without having all the information. And I don't appreciate being treated like a rubber stamp" based on someone's belief "that I don't need [this type of] . . . information and that I should make these orders because you say so. That's not how it works."

At the conclusion of the December 5 hearing, Judge Hardie refused to return Minor to Foster Parents' custody, and was even more definitive than she had been earlier, finding as follows: "I do find well beyond preponderance of the evidence, I find by clear and convincing evidence that removal is in [Minor's] best interest[,] and therefore, I uphold the decision of the [Bureau] and deny the request for return of the child." She closed the hearing with another pointed admonition directed to the Bureau: "[H]ow on Earth does [the Bureau] approve for placement a home in which a person's own parental rights have been terminated, he's been sentenced to state prison for [a] violent offense and has three children who are now adults who have sustained allegations of sexual abuse against other children? And the [Bureau] knows all this, I'm told. And they know that these adults come in and out of the home. . . . [For the Bureau to] utilize that household to place children who are in foster care . . . [is] outrageous to me." Judge Hardie then

6

turned to Minor's trial counsel and asked, "Did you know any of this?" The response was unequivocal: "No, Your Honor. Not at all."

## III. DISCUSSION

If we were to resolve these appeals on the record presented to the juvenile court at the .26 hearing, focusing solely on whether substantial evidence supports the juvenile court's finding that the beneficial relationship exception under section 366.26, subdivision (c)(1)(B)(i) does not apply—the only issue raised in the main briefs—we would have no trouble affirming. But proper application of the beneficial parental relationship exception involves a fact-bound weighing process (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575), and because Mother's C.C.P. section 909 motion casts doubt on the integrity of the record the juvenile court relied upon both in making the predicate finding that Minor was adoptable and in undertaking the weighing process to apply the parental benefit exception, the additional evidence Mother proffers,[5] if we consider it,

---

[5] Mother's C.C.P. section 909 motion attaches eight exhibits filed post-termination in Minor's case, consisting of a minute order filed September 19, 2018 following a hearing on the Bureau's petition for emergency removal of Minor from Foster Parents' home (Exhibit A); a minute order filed October 19, 2018 following a hearing on Foster Parents' objection to the removal of Minor from their home (Exhibit B); a Memorandum to Judge Hardie dated October 16, 2018, co-authored by the social worker's supervisor and by the Bureau's lead investigator for out-of-home investigations (Exhibit C); a minute order filed October 31, 2018 following a continued hearing on Foster Parents' objection to the removal of Minor from their home (Exhibit D); a minute order filed November 14, 2018 following a continued hearing on Foster Parents' objection to the removal of Minor from their home (Exhibit E); the Court Appointed Special Advocate's (CASA) Post-Permanency Report and Recommendation to the Juvenile Court of Contra Costa County filed January 16, 2019 (Exhibit F); the Bureau's Post-Permanency Status Review filed January 16, 2019 (Exhibit G); and a minute order filed January 16, 2019 following the six-month post-permanency status review (Exhibit H).

Mother was no longer allowed to participate in the proceedings in Minor's dependency post-termination and thus did not have access to any transcripts of the hearings referenced in her Exhibits A through H, or any of the documentary evidence considered by the court at those hearings. As a result, while the exhibits she proffers highlight the major developments in the case post-termination, they give us limited information about why Judge Hardie entered the orders she did. To clarify that, on our

7

fundamentally changes the character of what we must decide.  To flesh out how things change, we directed the parties to address the following three issues in supplemental briefing and at oral argument.

First, Mother's C.C.P. section 909 motion charges the Bureau with failing to disclose evidence material to the issue of adoptability in the .26 Report, which led the juvenile court to find that Minor was adoptable by foster parents J.M. and C.P. (collectively, Foster Parents)—a finding that the transcripts of post-termination proceedings make abundantly clear would never have been made had the court known all the pertinent facts.  In light of this allegation, we directed the parties to address whether the criteria for issuance of a writ of error *coram vobis*, a rarely invoked appellate remedy reserved for cases involving corruption of the trial court record by "extrinsic fraud" (see *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295–1296), are satisfied in this case.

Second, after we directed the parties to submit supplemental briefing on the *coram vobis* issue, the Bureau—which had initially staked out a position urging us to affirm without taking into account any postjudgment evidence probative of its withholding of information at the .26 hearing—stipulated to reversal.  In a joint application for reversal and remand by stipulation, the Bureau, Mother, Father, and Minor (for whom we appointed counsel on appeal), together, now propose that we return the case to the juvenile court for a new .26 hearing.  The joint application is vague as to the legal basis for reversing, other than the parties' agreement to our doing so.  We are, of course, empowered to accept a stipulation under Code of Civil Procedure section 128, subdivision (a)(8) and reverse summarily, but that raises the question:  Should we do so here?

---

own motion we directed that the following supplemental materials be lodged with this court:  (1) transcripts of hearings dated October 19, 2018, October 31, 2018, November 14, 2018, December 5, 2018, January 16, 2019, and February 13, 2019, (2) the 2017 Investigation Report that was provided to the juvenile court at the October 19, 2018 hearing, and (3) the social worker's case notes that were provided to the juvenile court at the October 31, 2018 hearing.  (See fn. 3, ante.)

Third, prior to the .26 hearing, under section 366.22, subdivision (c)(1)(D), the Bureau was required to file a report with the juvenile court analyzing the likelihood that Minor would be adopted, including in that report a "preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or guardian, particularly the caretaker[.]"  And in its preliminary assessment of identified prospective adoptive parents, the Bureau was specifically obligated under section 366.22, subdivision (c)(1)(D) to supply "a social history including screening for criminal records and prior referrals for child abuse or neglect[.]"  This statutory reporting obligation raises the third and final issue we asked the parties to address:  Did the Bureau breach its obligation to provide a preliminary assessment of adoptability here, and if so, was the breach so egregious as to rise to the level of a due process violation, justifying reversal on that basis?

We address these three issues in turn.

**A.** ***We Grant Mother's Motion to Receive Additional Evidence on Appeal, Deny the Bureau's Motion to Strike, and Find it Unnecessary to Reach the* Coram Vobis *Issue in Light of the Stipulation to Reversal***

"It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .' [Citation.] The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal. 'Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and [rule 8.252] of the California Rules of Court, the authority should be exercised sparingly. [Citation.] Absent exceptional circumstances, no such findings should be made.' " (*Zeth S., supra,* 31 Cal.4th at p. 405.)

*Zeth S.* involved a situation much like this case. There, after a termination of parental rights, and during the pendency of an appeal of the termination on grounds the juvenile court erred in failing to apply the parental benefit exception, appointed appellate counsel for the minor (Zeth) wrote a letter seeking to bring to the attention of the Court of Appeal information that allegedly showed termination of parental rights was not in Zeth's best interest. (*Zeth S.*, *supra*, 31 Cal.4th at pp. 403–404.) Based on unsworn statements in that letter, it was argued, there had been a change in circumstances, warranting reversal of the termination order and remand for a new .26 hearing. (*Id.* at p. 404.) Addressing the question whether it is permissible in a dependency appeal from an order terminating parental rights to "consider postjudgment evidence that was never before the juvenile court, and [to] rely on such evidence outside the record on appeal to reverse the judgment," our Supreme Court held that "the general answer is no," although "in the rare and compelling case an exception may be warranted." (*Id.* at pp. 399–400.)

Beyond the facts presented there, *Zeth S.* had "no occasion to further address the question whether any particular circumstances may give rise to an exception to the general rule that postjudgment evidence is inadmissible in a juvenile dependency appeal from an order terminating parental rights," but it did acknowledge a case where "one such exception" had been recognized. (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.) In that case, *In re Elise K.* (1982) 33 Cal.3d 138 (*Elise K.*), one of its own, "all of the parties were in agreement, and offered to stipulate, that due to changed circumstances and the minor's advanced age, the minor in that case *was no longer adoptable* within the meaning of former Civil Code section 232, subdivision (a)(7), thereby undermining the foundational basis of the trial court's order terminating mother's custody and control over the minor." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11, original italics.) In a brief *per curiam* opinion, the Supreme Court "determined that it was appropriate to accept that stipulation, and on that basis the judgment of the superior court was reversed." (*Ibid*; see 33 Cal.3d at p. 139.)

In its motion to strike Mother's C.C.P. section 909 motion, the Bureau contends that *Elise K.* has been superseded by legislation in the years since *Zeth S.* was decided. In cases like *Elise K.*, the Bureau suggests, where postjudgment developments have fundamentally changed a child's prospects for adoption, the Legislature has now provided a remedy. The Bureau points to section 366.26, subdivision (i)(3), enacted by amendment in 2005,[6] which provides that "[a] child who has not been adopted after the passage of at least three years from the date the court terminated parental rights and for whom the court has determined adoption is no longer the permanent plan may" seek reinstatement of parental rights by section 388 petition, thereby giving the child, according to the Bureau, an "avenue to review postjudgment changes in circumstances affecting [his] adoptability."

We do not agree that that is an adequate remedy for Minor. Perhaps it could be for a child who was determined to be generally adoptable, but it is not here. Whether a

---

[6] Statutes 2005, chapter 634, section 2.

child is likely to be adopted is the "pivotal question" at a section 366.26 hearing (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 804) and it is a question on which the child welfare agency carries the burden of proof (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623). Section 366.26, subdivision (c)(1) provides, in relevant part, that "[i]f the [juvenile] court determines based upon the [adoption] assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the [juvenile] court shall terminate parental rights and order the child placed for adoption." In determining the child's adoptability, the court must focus on the child — "whether the child's age, physical condition, and emotional state" lends him or her to finding an adoptive family. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 (*Carl R.*).)

Because the issue focuses on the child, adoptability generally falls into two categories: General adoptability, and specific adoptability. (*Carl R., supra,* 128 Cal.App.4th at p. 1061.) The existence of a committed prospective adoptive parent is relevant, but is not determinative. (*In re David H.* (1995) 33 Cal.App.4th 368, 378 (*David H.*); see *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 ["a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*"], original italics.) A child who is happy, healthy and young, with no discernable developmental problems, can be found to be generally adoptable even if no prospective adoptive family is " 'waiting in the wings,' " ready to adopt. (*Sarah M., supra,* 22 Cal.App.4th at p. 1649; *In re G.M.* (2010) 181 Cal.App.4th 552, 562.) For a specifically adoptable child, on the other hand, the court's inquiry is different. The court must determine whether there are any legal impediments to adoption and whether there is a prospective adoptive parent who is able to meet the needs of the child. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

General adoptability was not addressed in this case, at least not explicitly. Minor is a high-needs child who, despite his tender years, has a history of mental instability that must be managed with a regimen of psychotropic medication and intensive therapy, and he has struggled to progress in school. Not surprisingly, the sole focus of the Bureau's

12

adoptability assessment at the .26 hearing was on Minor's prospects for adoption with Foster Parents, who, for all the problems that later surfaced concerning their suitability to be adoptive parents, demonstrated over the course of Minor's more than two years in their care, that they understood his challenging circumstances, and nonetheless were committed to adopting him. Thus, as Judge Hardie pointed out at the October 31, 2018 hearing, she found Minor adoptable "*because* he was in a home with committed caregivers who wanted to adopt him." (Italics added.) It is always critical to make an accurate determination of adoptability at a .26 hearing, but it is particularly critical in a specific adoptability case.

Taking a "let's wait-and-see" attitude towards Minor's adoptability for three years may, in fact, serve to compound the error. We are told Minor has shown resilience and adjusted well in the emergency foster placement where he was sent after his removal from Foster Parents' home, but his caregivers there have made clear they have no interest in adoption. As a result, there is some possibility here that the Bureau mistakenly put Minor "in the position of having neither a parent nor a prospect of gaining one through adoption" (*Elise K.*, *supra*, 33 Cal.3d at p. 148 (conc. opn. of Bird, C.J.)), thus effectively rendering him a legal orphan, an outcome the law abhors.[7] If Minor now has no realistic prospect for adoption—a matter that can only be determined at a new .26 hearing, on a fuller record—putting off a review of his adoptability for several years would be the opposite of the permanence and stability the statutory scheme seeks to bring about.

Accordingly, we will grant Mother's motion to receive additional evidence on appeal under the *Elise K.* exception to the rule handed down in *Zeth S.* In light of the parties' stipulation that "subsequent events" after the .26 hearing in this case have "undermined the juvenile court's finding that [Minor] was likely to be adopted," and their stipulation to reversal on that ground, we conclude that this is one of those "rare and

---

[7] *Carl R., supra,* 128 Cal.App.4th at page 1062, footnote 6; *In re Jayson T.* (2002) 97 Cal.App.4th 75, 85, disapproved on other grounds in *Zeth S.*, *supra*, 31 Cal.4th at pages 413–414.

compelling case[s]" (*Zeth S.*, *supra*, 31 Cal.4th at p. 399) "where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much[.]" (*Id.* at p. 413, fn. 11.)[8] Having concluded the *Elise K.* exception to *Zeth S.* applies, we have no occasion to reach the further issue whether a writ of error *coram vobis* is warranted in this case.

**B.** ***We Decline to Accept the Stipulated Reversal as the Basis For Resolving These Appeals***

"[M]otions to reverse or vacate duly entered judgments are governed by [Code of Civil Procedure] section 128, subdivision (a)(8). Subdivision (a) enumerates the powers of the courts of this state. Prior to 1999, the last enumerated power, set forth in subdivision (a)(8), simply provided that every court shall have the power '(8) to amend and control its process and orders so as to make them conform to law and justice.' Legislation in 1999 added to that sentence the following language: 'An appellate court shall not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties unless the court finds both of the following: [¶] (A) There is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal. [¶] (B) The reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement.' (Stats. 1999, ch. 508, § 1.)" (*Hardisty v. Hinton & Alfert* (2004) 124 Cal.App.4th 999, 1005 (*Hardisty*).)

"The 1999 amendment was designed to supersede the opinion of the California Supreme Court in *Neary v. Regents of the University of California* (1992) 3 Cal.4th 273

---

[8] Having granted Mother's C.C.P. section 909 motion, we take judicial notice of the transcripts of the post-termination hearings that took place in this case on October 19, 2018, October 31, 2018, December 5, 2018, January 16, 2019, and February 13, 2019. (Evid. Code, §§ 459, 452, subd. (d).) We also take judicial notice of the 2017 Investigation Report and the social worker's 2017 case notes, since they were presented to and considered by the juvenile court at those hearings (*ibid*.) and they "help complete the context of this case." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 306, fn. 2; see fn. 3, ante.)

[] (*Neary*).  (*Muccianti v. Willow Creek Care Center* (2003) 108 Cal.App.4th 13, 19 [ ].)  *Neary* stood for the proposition that 'when the parties to an action agree to settle their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule.'  (*Neary,* at p. 284.)  The *Neary* rule amounted to a presumption that motions for stipulated reversal should ordinarily be granted.  The 1999 amendment reverses *Neary*'s presumption in favor of accepting stipulated reversals and instead creates a presumption against stipulated reversals.  (Martin & Shatz, *Reverse Course: CCP Section 128(a)(8) Has Succeeded in Reversing the Presumption in Favor of Stipulated Reversals* (Feb. 2003) 25 L.A. Lawyer 24.)"  (*Hardisty*, *supra*, 124 Cal.App.4th at pp. 1005–1006.)

"Prudent rulings on motions for stipulated reversal have always required information that is usually not in the record or readily apparent.  (See 9 Witkin, Cal Procedure [(4th ed. 1997)] Appeal, § 783, pp. 817–818.)  The parties ordinarily possess or can obtain such information, but if the information would justify denial of their request for reversal they may not be motivated to seek it or, if they have the information, to disclose it.  In 1994, shortly after *Neary* was decided, this appellate district addressed the problem by promulgating [former] local rule 8 [(Ct. App. First. Dist., Local Rules, former rule 8, now codified as rule 4 (local rule 4); see also Ct. App. First. Dist., Proposed Local Rules, rule 10, scheduled to take effect in summer 2019)], which was designed to call the attention of counsel to the nature of the disclosure required of parties seeking stipulated reversal."  (*Hardisty*, *supra*, 124 Cal.App.4th at p. 1007.)  Among other things, "Local rule [4] . . . make[s] explicit a requirement implicit in subdivision (a)(8) of section 128: the duty of counsel for parties to a joint motion for stipulated reversal to affirmatively demonstrate a basis for each of the three findings required to be made by the statute."  (*Hardisty,* at p. 1008.)

We are not persuaded that the joint application submitted by the parties offers reasons for stipulated reversal that overcome the presumption against accepting stipulated reversals on appeal.  We applaud the professionalism shown by counsel for the parties in

15

settling once it became clear there was a serious problem with the record here, followed by their diligent efforts to make the necessary showing under Code of Civil Procedure section 128, subdivision (a)(8), addressing each required item under local rule 4 in a joint application. But we do not agree with the suggestion in the parties' application that acceptance of a stipulated reversal "poses no risk that the public trust in the judiciary will be eroded[.]"

We are concerned about the broader public interest, beyond the interests of the parties involved in this specific case. Based on a joint declaration signed by all counsel, including Minor's trial counsel, the parties inform us that an "error occurred in this case because 1) the agency did not directly apprise the parties and the juvenile court of problems in [Minor's] prospective adoptive home, although the social worker entered information about [the June 2017 Investigation] . . . into her case notes; 2) those problems were unknown to the juvenile court and no party challenged [Minor's] adoptability; 3) the problems in the adoptive home led to [Minor's] removal from that home and placement in a temporary foster home; and 4) these circumstances undermine the juvenile court's finding that [Minor] is likely to be adopted within a reasonable time, which forms the basis for the order terminating parental rights."

Left vague in this recitation is any reference to the *legal* basis for reversing, other than the parties desire that we do so. Our concern is exactly what Judge Hardie highlighted at the end of the October 31, 2018 hearing: Public trust in the judiciary is uniquely at stake when the basis for termination of parental rights is called into question. While she ultimately accepted the Bureau's explanation for what happened in this case, she left little doubt that the withholding of information material to her assessment of Foster Parents' fitness as prospective adoptive parents—whatever the reasons for it—had obstructed her ability to discharge her judicial responsibilities. Not only do we share Judge Hardie's concerns about the insidious effect of inaccurate and incomplete disclosure by child welfare agencies in the section 366.26 process, but we believe it is important to explain—using this case as an instructive example—how fundamentally inconsistent it is with the statutory scheme.

16

**C.** ***The Bureau Breached Its Statutory Obligation to Provide A Full, Fair and Even-Handed Preliminary Assessment of Adoptability, and that Breach Violated Minor's Due Process Rights***

1. *Violation of Statutory Reporting Obligation Under Section 366.22, Subdivision (c)*

"In addition to providing child welfare services to the family involved in a dependency proceeding, the . . . social services agency provides essential information to the court. At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court." (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7 (*Ashley M.*).) The required reports in dependency proceedings vary by hearing, but in general they are all designed to make sure the court has the evidence before it to make the necessary findings at each stage of the proceeding. (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2019) § 2.63[2][g][iii], p. 2–265 (Seiser & Kumli).) Operationally, "[t]he duties to furnish child welfare services and to provide reports and recommendations to the juvenile court are actually placed by statute upon 'the social worker.' " (*Ashley M.*, *supra*, 114 Cal.App.4th at p. 8.)

In carrying out these functions the social worker has been likened to a prosecutor and thus is serving as an arm of the state in this regard, working in collaboration with others at the agency, including counsel. (See *Elene H. v. County of Los Angeles* (1990) 220 Cal.App.3d 1445, 1452; Seiser & Kumli, *supra*, § 2.63[1], p. 2–259.) But unlike counsel for the agency, social workers are not advocates in the adversarial sense. Social workers make recommendations, but because their professional role is best described as that of a "disinterested part[y]," their reports to the court must have the characteristics of "objectivity and expertise." (*In re Malinda S.* (1990) 51 Cal.3d 368, 377, superseded by statute on another point as stated in *People v. Otto* (2001) 26 Cal.4th 200, 207.) In fact, it is the recognized professional objectivity of social workers, and the "trustworthiness" and "reliability" of their work, that justifies the admissibility of their reports in dependency proceedings, despite the layers of hearsay these reports typically contain.

17

(*Ibid.*)

The need for objective reporting from the social welfare agency is nowhere more important than at the permanency planning hearing under section 366.26. "Whenever a court orders that a hearing pursuant to Section 366.26 . . . shall be held, it shall direct the agency supervising the child and the county adoption agency . . . to prepare an assessment that shall include" detailed and specific information bearing on the issue of adoptability. (§ 366.22, subd. (c)(1) [reports required for .26 hearings set at 18-month permanency review hearings].)[9]  Such a report must analyze "the likelihood that the child will be adopted if parental rights are terminated" (§ 366.22, subd. (c)(1)(F)) and provide a "preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, particularly the caretaker" (*id.*, subd. (c)(1)(D)).[10]  Among the required information for a such a preliminary assessment is "a social history including screening for criminal records and prior referrals for child abuse or neglect[.]"  (§ 366.22, subd. (c)(1)(D).)

Here, the task fell to the social worker to prepare and file a full, fair and even-handed pre-adoption study prior to the .26 hearing revealing all information specified in section 366.22, subdivision (c)(1)(D).  The Bureau makes no serious attempt to contend that what she filed complied with that obligation.  While allowing it might be argued, at worst, that the .26 Report was "weak and did not fully meet all statutory reporting requirements," the Bureau contends the omissions in the .26 Report were not material to the outcome.  At the October 31, 2018 hearing, the Bureau argues, all Judge Hardie said was that in light of the newly revealed information bearing on adoptability she "would

---

[9] See sections 361.5, subdivision (g)(1) (reports required for .26 hearings set at disposition hearings after denial of reunification services), 366.21, subdivision (i)(1) (reports required for .26 hearings set at six-month review hearings or at 12-month permanency hearings) and 366.25, subdivision (b)(1) (reports required for .26 hearings set at 24-month subsequent permanency review hearings).

[10] See sections 361.5, subdivision (g)(1)(D), 366.21, subdivision (i)(1)(D) and 366.25, subdivision (b)(1)(D).

have had a more difficult time making certain findings about adoptability," not that she would have reached a different result. We cannot agree that this shows the outcome would have been the same had the 2017 Investigation been revealed in the .26 Report. It is abundantly clear based on Judge Hardie's more definitive comments on December 5— after an evidentiary hearing spanning three hearing days—that she never would have found Minor to be specifically adoptable had she known the true facts.

Emphasizing the issue of general adoptability could have been litigated, but was never pressed, the Bureau points out that prior to the .26 hearing the social worker produced her case notes in discovery, and that Father's sister, Aunt T., filed two declarations making derogatory allegations against J.M. in an unsuccessful change-of-custody application. According to the Bureau, all parties were aware of plenty of information that cast into doubt Foster Parents' eligibility to adopt—some of it already known to the court—yet neither Parents nor Minor chose to pursue the issue.[11] This is, in

_____

[11] The Bureau argues that "[w]hile the . . . social worker should have included the information regarding the prospective adoptive parents' criminal and child welfare history[,] . . . it should also be noted the underlying purpose of requiring this history in the preliminary assessment was met as the prospective adoptive parents had been approved as [a resource family] after a vigorous application process." In support of this contention, the Bureau advances a somewhat convoluted explanation, premised on the idea that "the preliminary assessment report was intended as a precursor to an approved homestudy report which was the vehicle for adoption prior to the changes that took place effective January 1, 2017 that dramatically changed the approval process for 'resource families[]' " under section 16519.5, subdivision (d). According to the Bureau, "section 16519.5(d) defines the resource family as an individual or family that has successfully met both the home environment assessment standards and the permanency assessment criteria." Quoting from the Seiser & Kumli treatise, the Bureau then tells us " '[t]he permanency assessment will replace the adoption homestudy.' " It is indeed true that section 16519.5, subdivision (d), introduced a new, streamlined process for approval of resource families. (*See* Seiser & Kumli, *supra*, § 2.127[9], p. 2–476 ["The goal of this revised approval process is to offer a unified, family friendly, and child-centered approval process for all families seeking to care for children including those homes seeking guardianship or adoption [citation]. . . . Previously, the approval process was different for each type of placement."].) But these changes in the administrative vetting process for resource families do not relieve child welfare agencies of the obligation to comply with their statutory reporting obligations to the juvenile court, as the Bureau implicitly

effect, a waiver argument. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 502.) But while it is typically true that " 'points not urged in the trial court cannot be raised on appeal[,] [citation] [t]he contention that a judgment is not supported by substantial evidence . . . is an obvious exception to the rule.' " (*In re Brian P., supra,* 99 Cal.App.4th at p. 623.) Without the social worker's flawed .26 Report, we see no substantial record evidence to support an adoptability finding, whether viewed as an express finding of special adoptability or an implied finding of general adoptability. By affirming, we would be relieving the Bureau of its burden of proof and allowing an order unsupported by substantial evidence to stand. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561.)

In general, "[w]here an investigative report is required prior to the making of a dependency decision, and it is *completely* omitted, due process may be implicated because a cornerstone of the evidentiary structure upon which both the court and parents are entitled to rely has been omitted." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413, original italics (*Crystal J.*).) Conversely, "[w]here . . . the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process." (*Ibid.*, original italics.) Given the complete omission of a mandatory component of the .26 Report under section 366.22, subdivision (c)(1)(D), we conclude there was a statutory violation here, at least. Normally, for pure state law error, we evaluate prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which places the burden on an appellant to show a reasonable probability she would have achieved a more favorable outcome absent the error. Although we can say for sure that the issue of special adoptability would have been decided differently absent the error here, we cannot know what would have happened had the issue of general adoptability been adjudicated. Because the outcome

concedes in acknowledging that "the social worker should have included" information required by section 366.22, subdivision (c)(1)(D) in the .26 Report. It is simply not the case that the "underlying purpose" of this reporting obligation "was met" simply because the appropriate administrative vetting for Foster Parents as a resource family had been done.

there is wholly within the realm of speculation, the correct prejudice analysis comes down to who bears the risk of error on appeal. And to decide that, we must determine whether we are dealing with error of federal constitutional magnitude.

2. *Due Process Violation*

Was the Bureau's violation of section 366.22, subdivision (c)(1)(D) so egregious as to rise to the level of a denial of due process? Parents, joined by Minor, say that it was. We answer the question no as to Parents, but yes as to Minor.[12]

Starting with Parents first, their parental unfitness had already been adjudicated by the time the case reached the permanency plan selection stage. Thus, going into the .26 hearing, their fundamental liberty interest in the care, custody and control of Minor was attenuated. Their only chance at preserving a legal bond to Minor at that point turned on the beneficial parental relationship exception, an issue on which they bore the burden of proof. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372–1373.) Moreover, Parents were in an adverse position to the Bureau, as they had been throughout the proceeding, and they contested the Bureau's proposed recommendations and findings at the .26 hearing. Nothing stopped them from cross-examining Foster Parents or the social worker, or from putting on any evidence they wished to present.

The Bureau contends that, at the .26 hearing, it did nothing to prevent Parents from having a fair opportunity to litigate adoptability or any other issue, had they chosen to do so. Instead, they elected to submit on the .26 Report. While the information in the social worker's case notes may have been limited and Aunt T.'s declarations may have been conclusory and unsubstantiated, the Bureau points out that "even without the complete history it is clear that the parties possessed enough evidence of [J.M.'s] criminal and child welfare history to mount a possible legal impediment challenge, not only regarding this history but also to the marital status of the prospective adoptive

---

[12] Minor's appointed appellate counsel, in addition to joining the parties' stipulation to reversal of the order terminating parental rights, filed a brief urging reversal and remand for a new .26 hearing on the ground the juvenile court's adoptability finding has been undermined. We construe this brief as a joinder in Parents' appeal to the extent it seeks reversal of the .26 order.

parents." "At the very least," the Bureau argues, "the parties had enough evidence to request additional discovery[.]" (See Cal. Rules of Court, rule 5.546(c), (d) [agency's discovery obligations in § 300 proceedings], and (f) [motions to compel discovery].)

*David H.*, *supra*, 33 Cal.App.4th 368, a case cited by the Bureau in its supplemental reply brief addressing the issue of *coram vobis*, is useful by way of analogy. At issue there was a claim by a father whose parental rights had been terminated that he declined to contest adoptability at the .26 hearing because the child welfare agency misrepresented to him that his son, David, had a set of committed prospective adoptive parents waiting for him. That was not just misleading. It was outright false. (*Id.* at pp. 374–375.) On appeal of the order terminating his parental rights, the father argued, among other things, extrinsic fraud (*id.* at p. 384), which some courts have described as tantamount to a due process violation. (See *Los Angeles Airways, Inc. v. Hughes Tool Co.* (1979) 95 Cal.App.3d 1, 7 ["in any attempted collateral attack based on lately discovered evidence, it is crucial to be able to demonstrate what amounts to due process deprivation: that the issue in question was really never litigated in any meaningful fashion"].)

In rejecting that claim, the appellate panel in *David H.* said this: "Parental rights are terminated because (1) the parents have been found so derelict in their duties to their children, or so unable to fulfill those duties, that it would be harmful to return the child to their custody [citation], and (2) the child has a chance of finding a caring, stable and nurturing home elsewhere [citation]. In David's case, he was freed from inadequate parents, but his prospective adoptive home proved to be a mirage and a hoax. It would be a tragic anomaly if the derelict parents could now further impede David's chances of finding a secure home by forcing relitigation of the permanent plan on the ground of injuries they feel were done to *them.* [¶] As a general matter, it would be inimical to the policies underlying the juvenile court law to allow parents to raise a collateral challenge to an order terminating parental rights on the ground that the child's post-termination placement did not meet with the parents' expectations. Such relief is not available, whether the parents' expectations were not met because of an uncontrollable turn of fate,

22

[citation] or for any other reason, including intentional misrepresentations concerning the potential placement." (*David H.*, *supra*, 33 Cal.App.4th at pp. 384–385.)

With respect to Parents, the analysis in *David H.* is apt. But notably, the *David H.* opinion was careful to point out that its holding did not apply to David, the minor in that case. "Whether there was fraud or other wrongdoing as to David himself is another question, which we do not address," the court observed. (*David H.*, *supra*, 33 Cal.App.4th at p. 381, fn. 7.) "David, of course, was left parentless without the certainty of a new and secure home which he would, with reasonable probability, have had, absent the misrepresentations." (*Ibid.*) So, too, with Minor in this case. In juvenile dependency proceedings, children "have fundamental interests of their own that may diverge from the interests of the parent." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419.) The centrality of the issue of adoptability at a .26 hearing heightens "the relative severity of the consequences of an erroneous decision on the child. With the likelihood of adoption, the child is subject to a dramatically different set of outcomes as a result of the termination hearing" compared to what is at stake for him earlier in the proceeding. (*In re Cristella C.*, *supra,* 6 Cal.App.4th at p. 1370.) "Instead of a bleak future in foster care limbo on the one hand, and return to a possibly abusive household on the other, the likelihood of adoption effectively realigns the consequences of an erroneous decision in termination proceedings: The alternatives are now life with a stable family who have already sacrificed for the sake of the child's well-being versus life with . . . parent[s] to whom return of the child has been repeatedly shown to be detrimental." (*Ibid.*)

Given the stakes for the Minor at the .26 hearing, he had a fundamental liberty interest in accurate determination of the issue of adoptability on a full and complete record. Section 366.26, subdivision (c)(1) protects that interest by holding the child welfare agency to the standard of clear and convincing proof. But quantum of proof is not the only protection minor-dependents have at .26 hearings. The Legislature has also been quite clear that the child welfare agency's pre-adoption study supplies the evidentiary foundation on which the juvenile court's adoptability determination must rest. (See § 366.26, subd. (b) ["At the hearing, . . . the court, in order to provide stable,

23

permanent homes for these [dependent] children, shall review the report as specified in Section 361.5, 366.21, 366.22, or 366.25 [and] shall indicate that the court has read and considered it . . . ."].)  It is also important to keep in mind the unique obligation of trust and confidence that the child welfare agency has in the permanency selection phase of a dependency proceeding.  The minor-dependent is entitled to view the agency as his "champion" (*In re Angelia P.* (1981) 28 Cal.3d 908, 919) and to place complete faith in its expert analysis of his adoptability.  Thus, going into the .26 hearing, Minor, unlike Parents, had no incentive to probe or challenge the Bureau's litigating position, and at the hearing he elected not to contest any of the Bureau's proposed recommendations or findings.

Mindful of Minor's vulnerable position going into the .26 hearing, we apply *Crystal J., supra,* 12 Cal.App.4th at page 413—based on complete omission of one of the mandatory components of a section 366.22, subdivision (c)(1) report—but we add a corollary to the rule laid down there:  The party most likely to suffer a due process violation when a child welfare agency submits a wholly inadequate report, and the only party who suffered it here, is the minor-dependent.  By failing to provide the information required by section 366.22, subdivision (c)(1)(D), the Bureau not only destroyed the evidentiary foundation for an accurate determination of Minor's adoptability, but deprived him of the assistance of fully informed counsel.  Minor could have mounted a challenge to whether the Bureau met its burden of proof, but his counsel never knew she had a basis to do so.  Under these circumstances, we conclude that, just as the suppression of information material to guilt or innocence in a criminal trial violates the due process right of the defendant to a fair trial (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)), the Bureau violated Minor's due process right to a fair permanency selection and planning hearing.  The Bureau insists, as it did before Judge Hardie, that the social worker's failure to disclose all of the information that was finally revealed in October 2018 was a good faith mistake.  Perhaps it was.  But just as with *Brady*, the obligation to disclose is operative "irrespective of the good faith or bad faith of the prosecution."  (*Id.* at p. 87.)

When we deal with error of federal constitutional dimension in dependency cases, it is unclear whether the prejudice test is that of harmlessness beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24; see *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1144–1146) or by clear and convincing proof (see *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1514–1515; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1157, fn. 9). We need not wade into this nuanced debate over the standard of review, for under either approach, unlike under *Watson*, the burden is on the Bureau to show harmlessness, and on this record that burden has not been met. We cannot be sure beyond a reasonable doubt, or by clear and convincing proof, that Judge Hardie would have found Minor adoptable had the Bureau filed a fully compliant section 366.22, subdivision (c)(1) report. Given the preference for adoption, perhaps she would have done so by finding Minor generally adoptable. Or perhaps she would have opted for a permanent plan other than adoption.

Here again, Judge Hardie went to the heart of the matter, articulating the prejudice analysis well, albeit without framing it as a matter of due process. She observed: "Could you say, generally, that [Minor] is, by clear and convincing evidence, likely to be adopted? [¶] I don't know. I'm not so sure. [¶] . . . [T]he Court may have viewed his safety and situation differently than the [Bureau]. And I think the Court should have been given that opportunity to make that assessment. [¶] I think his Attorney should have been given the information to make whatever arguments that she might have wanted to make on his behalf." With those comments, Judge Hardie captured the nub of it. The .26 hearing in this case took place nearly 10 months ago, which was 31 months after Minor's original detention. By withholding evidence material to the determination of adoptability, the Bureau, in effect, added what will likely be another year onto the timetable before Minor's permanency is decided. That is regrettable, but it is also unavoidable.

## IV. CONCLUSION AND DISPOSITION

The .26 order and findings are reversed. Without intimating any view as to what permanency option might be best in this case, or whether the parental relationship benefit

25

exception might apply, the case is remanded with directions that the Bureau prepare an updated section 366.22, subdivision (c)(1) report specifically assessing whether Minor is likely to be adopted within a reasonable time. The juvenile court shall then conduct a new section 366.26 hearing.

_____
STREETER, ACTING P.J.

We concur:


_____
TUCHER, J.


_____
BROWN, J.


A155254, A155571

27

A155254, A155571/In re B.D.

Trial Court:                           Contra Costa County Superior Court

Trial Judge:                           Hon. Rebecca C. Hardie

Counsel:

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and
    Appellant J.D.

First District Appellate Project, Jonathan Soglin and Louise E. Collari, under
    appointment by the Court of Appeal, for Defendant and Appellant G.D.

Sharon L. Anderson, County Counsel, Lisa M. O'Connor, Deputy County Counsel for
    Plaintiff and Respondent.

Leslie A. Barry, under appointment by the Court of Appeal, for Minor.