Filed 6/26/25  In re M.P. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.P., A Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>            v.<br><br> A.G. et al.,<br><br>        Defendants and Appellants. | G065106<br><br>(Super. Ct. No. 22DP1527)<br><br>O P I N I O N |

        Appeal from an order of the Superior Court of Orange County, Lindsey E. Martinez, Judge. Affirmed.

        Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant A.G.

        John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant J.P.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, for Plaintiff and Respondent.

\*          \*          \*

A.G. (Mother) and J.P. (Father) (collectively "The parents") appeal from the juvenile court's order terminating their parental rights and placing minor M.P. for adoption following a Welfare and Institutions Code section 366.26 hearing (366.26 hearing).[1] The parents argue no substantial evidence supports the court's finding that M.P. was specifically adoptable. We conclude Orange County Social Services Agency (SSA) met its burden to show by clear and convincing evidence that M.P. was specifically adoptable. The juvenile court could rely on SSA's reports to make its adoptability finding. Accordingly, we affirm.

STATEMENT OF THE CASE

On November 9, 2022, an emergency response social worker requested a non-custody petition based, in part, on concerns that the parents were neglecting M.P's medical needs. M.P. was born premature, missing a right kidney, and suffering from a spinal anomaly and a rare heart defect. M.P. could not swallow and had to have a gastrointestinal (GI) tube inserted for feeding. SSA filed the petition on November 14, 2022, and at the November 15, 2022 hearing on the petition, the juvenile court conditionally ordered the minor to remain under the care of the parents.

On November 18, 2022, M.P. was admitted to CHOC Children's Hospital for a "very dirty" GI tube. Subsequently, SSA sought a warrant to remove M.P. from the parents' custody, which the juvenile court granted. On

---

[1] All further statutory references are to the Welfare & Institutions Code, unless otherwise stated.

2

November 29, 2022, SSA filed a petition under section 300, subdivision (b), alleging the parents neglected M.P.'s serious medical needs. The juvenile court found a prima facie case had been made, and ordered the minor temporarily placed in a community care facility, licensed as a group home, or similar placement.

On January 9, 2023, M.P. was discharged from the hospital and placed with foster parents. They cared for M.P. for the remainder of this case.

At the jurisdiction/disposition hearing on March 8, 2023, the juvenile court found the allegations of the dependency petition true, declared the minor a dependent, and ordered reunification services for the parents.

A combined six-, 12- and 18-month review hearing was held on July 17, 2024. In connection with this hearing, SSA submitted various reports. In the September 7, 2023 six-month review report, SSA recommended terminating reunification services and setting a 366.26 hearing date. SSA reported that M.P. was doing well with her foster parents. On May 17, 2023, a social worker had an in-person visit with the minor and a foster parent at CHOC Children's Clinic during a medical appointment. A pulmonologist stated M.P.'s lungs and heart sounded well, and a nutritionist stated her weight was increasing nicely. The foster parent confirmed M.P. had evaluations for speech and feeding therapies, and as of August 2023, was receiving therapy once a week.

In the November 6, 2023 Addendum Report, SSA stated that a social worker visited M.P. at the foster home on August 24, 2023. The minor "appeared happy and clean with no observable marks or bruises." She was smiling and making babbling sounds. The foster parent reported M.P. had gained weight, started to eat solid food, and beginning to crawl. The foster

3

parents confirmed they would "love the opportunity to adopt the child as she was part of their family."

The same social worker conducted another home visit on September 28, 2023. M.P. again was happy and clean with no observable marks or bruises. She was in good spirits and allowed the social worker to pick her up without fuss. A different social worker conducted a home visit on October 26, 2023. "[M.P.] appeared clean and free of any visible marks or bruises indicative of abuse." The foster parent reported M.P. was making good progress with her therapies. She could sit down, crawl and stand up with support. She was still on oxygen, but could sleep through the night.

In the December 13, 2023 Addendum Report, SSA stated a social worker visited M.P. on November 30, 2023. The minor was happy and clean with no visible marks or bruises. The foster parent reported M.P. was continuing to receive the same therapies, and she was making good progress.

In the January 9, 2024 Addendum Report, SSA stated a social worker visited M.P. at the foster home on December 27, 2023. M.P. was happy and healthy without marks or bruises. She was playing with her foster sister. She was continuing the same therapies and had frequent visits with various medical specialists.

In the March 21, 2024 Addendum Report, SSA stated a social worker visited M.P. on January 25 and February 29, 2024. She was healthy, well-groomed, and in good spirits. The foster parent updated the social worker on M.P.'s progress with her therapies and her upcoming medical appointments.

In the April 25, 2024 Addendum Report, SSA stated a social worker met M.P. and the caregiver at CHOC for M.P.'s pulmonary and nutritionist visits on March 20, 2024. M.P. cried when not held by the foster

4

parent. At the April 18, 2024 visit, the foster parent updated the social worker on M.P.'s improving medical conditions.

In the June 10, 2024 Addendum Report, SSA stated that during a May 2, 2023 visit by a social worker, the foster parent reported M.P. "has been healthy and doing really well." During the June 4, 2024 visit, the social worker observed M.P. appeared clean and comfortable in the arms of the foster parent. The social worker "did not observe any visible marks or bruises that were suspicious or indicative of abuse or neglect in the exposed extremities. The child appeared to be happy and content, as indicated by her giggling and constant smiles."

In a July 17, 2024 Addendum Report, SSA stated a senior social worker was assigned to the case, and the social worker conducted an unannounced in-person July 14, 2024 visit to observe the foster parent. The senior social worker concluded the foster parent "appears to have the ability to meet the child's basic health and safety needs. [She] appears to be providing quality care to the child. There were no signs of abuse or neglect observed or noted."

At the July 17, 2024 review hearing, the juvenile court found by a preponderance of the evidence that return of the minor would create a substantial risk of detriment to the child. Reunification services were terminated, but SSA agreed to keep providing services until the 366.26 hearing. The court set a 366.26 hearing for November 14, 2024.

SSA submitted a report in connection with the 366.26 hearing. In the report, SSA stated M.P. "appears to be generally adoptable, but the child is difficult to place due to the child's medical conditions." It opined M.P. was "specifically adoptable, as the child is currently placed with a caretaker who is interested in adoption." The report on the prospective adoptive parents had

been requested and was pending. The foster parents have "remained motivated and committed to caring for [M.P.] permanently through adoption if she is unable to reunify with her parents. They have an approved Community Care License as a Small Family Home."

At the January 13, 2024 contested 366.26 hearing, Mother's counsel argued SSA failed to meet its burden to demonstrate M.P. was adoptable. Alternatively, Mother met her burden to show the beneficial parent-child relationship and sibling relationship exceptions to adoption applied. Father also challenged M.P.'s adoptability. The juvenile court found the parents failed to show any of the exceptions to adoption applied. It found M.P. was likely to be adopted, terminated parental rights, and placed the child for adoption.

DISCUSSION

The parents contend no substantial evidence supports the juvenile court's finding that M.P. was adoptable. Specifically, they contend SSA failed to meet its burden to prove by clear and convincing evidence there was no legal impediment to the foster parents' adoption of M.P. We disagree.

Here, SSA opined M.P. was specifically adoptable because the foster parents wanted to adopt her. A "'minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.'" (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.) "Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent (Fam. Code, § 8601 [a prospective adoptive parent

6

must be at least 10 years older than the child, unless the adoption is by a stepparent, sister, brother, aunt, uncle, or first cousin and the court is satisfied that adoption by the parent and, if married, by the parent's spouse is in the best interests of the parties and is in the public interest regardless of the ages of the child and the prospective adoptive parent], [Fam. Code,] § 8602 [consent of a child over the age of 12 is necessary to the child's adoption], [Fam. Code,] § 8603 [a married person, not lawfully separated, may not adopt a child without the consent of the spouse, provided the spouse is capable of giving consent]). In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650.)

Here, at the 366.26 hearing, neither Mother nor Father argued there was a legal impediment to the foster parents adopting M.P. Moreover, the record does not suggest any legal impediment. As to the circumstances enumerated in *In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1642, there is no dispute the foster parents are at least 10 years older than M.P., than M.P. is currently under 12 years of age, and that both foster parents wished to adopt.

On appeal, the parents argue SSA failed to show the lack of two other legal impediments, specifically the foster parents' criminal history and child welfare or neglect history. (Cf. *In re B.D.* (2019) 35 Cal.App.5th 803, 811 & 817 [reversing order finding high-needs minor specifically adoptable and terminating parental rights because assessment report failed to include prospective adoptive parent's criminal and child welfare history].) However, SSA submitted an uncontradicted statement that the foster parents were licensed to operate a community care facility, which requires the operators to

have no criminal history and no evidence of substantiated child abuse or neglect. There is no evidence the community care license was improperly obtained, or that either foster parent had a criminal history or substantiated child abuse or neglect. The case is thus distinguishable from that of *In re B.D.*, where one of the foster parents had a criminal history and his three sons had suffered abuse. (See *id*. at p. 811.) Additionally, the numerous SSA reports show that no signs of abuse or neglect were observed over multiple in-person visits by multiple social workers. Indeed, the reports show the foster parents met M.P.'s medical and developmental needs, and the minor had bonded with the foster parent. Accordingly, "[a]bsent any evidentiary basis for questioning the feasibility of the minor's adoptive placement, we conclude the evidence sufficiently supports that the minor was specifically adoptable." (*In re Brandon T.*, *supra*, 164 Cal.App.4th at p. 1411.) In sum, SSA met its burden to show by clear and convincing evidence that M.P. was specifically adoptable, and the juvenile court could rely on SSA reports to find M.P. adoptable.

## DISPOSITION

The juvenile court's order terminating parental rights and placing the minor for adoption is affirmed.


DELANEY, J.

WE CONCUR:


SANCHEZ, ACTING P.J.


SCOTT, J.