Filed 5/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re MARY C., A Person Coming Under the Juvenile Court Law. | |
| ———————————————— | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. J.C., Defendant and Appellant. | A157256 (Sonoma County Super. Ct. No. DEP-4910) |
| ———————————————— | |
| In re MARY C. et al., Persons Coming Under the Juvenile Court Law. | |
| ———————————————— | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. J.C. et al., Defendants and Appellants. | A157444 (Sonoma County Super. Ct. Nos. DEP-4910, DEP-5365) |

J.C. (Father) and N.E. (Mother) appeal from the termination of their parental rights to their daughters, Mary C. (age five) and Aurora C. (age three) on May 24, 2019. They contend the judge erred in finding the children

adoptable because the report prepared by the Sonoma County Human Services Department (Department) for the hearing under Welfare and Institutions Code[1] section 366.26 (section 366.26 report) failed to contain substantial evidence supporting those findings. They claim the children have too many special needs to be generally adoptable and should not have been deemed specifically adoptable because the Department's section 366.26 report failed to contain all the statutorily required detail about the prospective adoptive mother and failed to report at all on her longtime partner who resides with her. Father also appeals from an order on April 2, 2019, terminating both parents' visitation with Mary, but he has made no arguments in support of that appeal. We shall affirm the judgment in the parents' appeal (A157444) and dismiss Father's separate appeal (A157256) as abandoned.

## I.  BACKGROUND

Mary and Aurora have already been involved in the dependency system for most of their young lives. Mary was first removed from her parents in June 2016, when she was 18 months old, due to both parents' drug abuse, which had led to their chronic unemployment and homelessness.[2] With the exception of 9 or 10 months spent with them in 2017, Mary has been out of her parents' custody ever since—by the time parental rights were terminated she had been in foster care for "almost half of her life." Aurora was only eight

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Even before the Sonoma County dependency petition, Mother had tested positive for marijuana and methamphetamine or amphetamine twice during hospital visits in Lake County in 2014 and 2015, including when Brother was born. The parents also came to the attention of the child welfare authorities in Arizona in February 2016 due to a loud argument and unsanitary and potentially dangerous conditions in their home.

2

months old when she was first removed. Mary and Aurora have one full sibling (Brother, age four) and an older paternal half-sister, neither of whom lives with them.

Mary and Aurora live together in the concurrent foster-adoptive home of Shawn D., a single woman in her forties who formerly had a career in early childhood development but now stays at home with the children. Shawn lives with her partner and their 16-year-old daughter. She also has two adult sons (ages 24 and 26), who live independently. Both Mary and Aurora have lived there since December 2017. Shawn has lived in the same home in Lake County for 13 years. Shawn and her partner appear to have a stable relationship, having raised their 16-year-old daughter together.

In June 2016 Mother and Father were found living in a tent with Mary (age 18 months) and Brother (8 months), with marijuana and a bong within easy reach of the children. Mother and Father both tested positive for methamphetamine and marijuana. Mary and Brother were removed and declared dependents under section 300, subdivision (b).

Mother managed to find work, the couple found transitional housing for six months, and they regained custody of Mary on a trial basis in March 2017. In April 2017, Aurora was born. Aurora was not detained, and Mary remained in her parents' care. When their time in transitional housing ran out at the end of July 2017, they moved in with the maternal grandmother in Lake County, which caused Mother to lose her job. A couple months later the grandmother decided to move out of state and the parents were homeless again. They were, in fact, still homeless and living in their car when Mary's dependency case was dismissed on November 20, 2017.

At the same hearing, reunification services were terminated for Mother and Father with respect to Brother, who had severe health problems,

3

including fetal alcohol spectrum disorder, related to his premature birth and exposure to substances in utero. In May 2018 parental rights were terminated and Brother was freed for adoption. He was adopted, and Mary and Aurora have contact with him and with their half-sister through Shawn's efforts.

The family was still homeless when, less than a month after Mary's dependency was dismissed, the police found them in a car parked at a gas station just after midnight with the engine running and Father slumped over in the driver's seat. Mother was passed out in the passenger seat, and Mary was strapped into her car seat in the back seat of the car. (Aurora was not mentioned in the police report.) The parents were difficult to rouse and appeared to be under the influence. Marijuana and paraphernalia were found throughout the car. Mother had a methamphetamine pipe in her jacket pocket and was cited for possession of drug paraphernalia.

Mary and Aurora were taken into protective custody on December 22, 2017, and later were declared dependents under section 300, subdivisions (b) and (j). Aurora had a flat, bald spot on the back of her head, apparently from being left in her car seat for prolonged periods, so that her head appeared to be deformed. She also had deteriorated muscle mass. She did not move much or make many sounds. During the dependency, her development improved markedly, as did Mary's. By March 20, 2018, Shawn had indicated her desire to adopt Mary and Aurora.

Meanwhile, the parents remained homeless, struggling daily just to get their basic needs met for food and shelter. They were looking for work, but apparently found none. They engaged in services half-heartedly, but they did participate regularly in visitation. Suffice it to say reunification efforts

failed, and the court terminated reunification services on January 4, 2019 and set a hearing under section 366.26.

Before the section 366.26 hearing was held, the maternal grandmother petitioned under section 388 to adopt Mary, but her petition was denied because Mary was already placed in a concurrent foster-adoptive home. The section 366.26 hearing was then delayed by the Department's request under section 388 for termination of visits between Mary and her parents. After a hearing, at which Mary's therapist testified that the visits were detrimental to Mary, the court terminated Mary's visitation with her parents. Father alone appealed that order.

On April 26, 2019, the Department filed its section 366.26 report, which recommended termination of parental rights and a permanent plan of adoption. The section 366.26 report described Mary as a generally healthy child who had certain medical and behavioral problems, which we shall discuss in more detail in part II.D., below. In an assessment by the regional center, Mary's cognitive and academic skills were in an age-appropriate range. She had attended preschool for a few months and was scheduled to begin a transitional kindergarten in September 2019.

The social worker wrote that Aurora was in general good health but had asthma and other medical and developmental issues we shall discuss in part II.D., below. The regional center had assessed Aurora as suffering global developmental delays. She had been referred for occupational therapy, physical therapy, and she had an early childhood educator who worked with her on cognitive, social, emotional, and adaptive skills.

The section 366.26 report reminded the court that the children had lived with Shawn and her family for 16 months, and assured it that Shawn was committed to providing a permanent home for them. Shawn's partner

5

was also potentially interested in adopting the girls. Nevertheless, throughout the record, Shawn is identified as the sole prospective adoptive parent.

The social worker had observed Mary and Aurora's connection to their foster-adoptive family, including Shawn's other children. Both children went to Shawn for physical comfort and appeared safe and secure in the foster-adoptive home. Both children had strong emotional ties to Shawn. The social worker opined that the children were generally adoptable, "as there are many potential adoptive families who would want to adopt them." She noted that although they have special needs, they are "young, sweet and engaging children."

On May 24, 2019, the court held the section 366.26 hearing. The court took judicial notice of its file, including the social workers' reports. Mother and Father testified in support of their claim of a beneficial parental relationship as an exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) After hearing testimony and argument, the court found the exception did not apply, found it was likely the children would be adopted, and selected adoption as the permanent plan. It terminated both parents' rights in the children.

Both parents appealed. They claim the termination of their parental rights should be reversed because the court's findings of adoptability for both children were unsupported by substantial evidence.

## II. DISCUSSION

### A. *The Department's Duty To Assess Adoptability*

Prior to the section 366.26 hearing, the Department was required to prepare and provide to the court a section 366.26 report, to include, among other things: (1) An evaluation of each child's medical, developmental, scholastic, mental, and emotional status (§§ 366.21, subd. (i)(1)(C)(i), 366.22,

6

subd. (c)(1)(C)(i)); (2) a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent, including a social history with screening for criminal history or prior referrals for child abuse or neglect, the prospective adoptive parent's capability to meet the child's needs, and his or her understanding of the legal and financial rights and responsibilities of adoption (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D)); (3) the relationship of the child to any identified prospective adoptive parent, the duration and character of the relationship, the degree of attachment of the child to the prospective adoptive parent, the adoptive parent's strong commitment to caring permanently for the child, the motivation for seeking adoption, a statement from the child concerning the placement and adoption (§§ 366.21, subd. (i)(1)(E), 366.22, subd. (c)(1)(E)); and (4) an analysis of the likelihood that the child will be adopted if parental rights are terminated (§§ 366.21, subd. (i)(1)(G), 366.22, subd. (c)(1)(F)). The purpose of the section 366.26 report is to provide the juvenile court with the information necessary to determine the permanent plan for the children. (See *In re B.D.* (2019) 35 Cal.App.5th 803, 821 (*B.D.*).)

Four components of the section 366.26 report were devoted to discussion of Shawn and her relationship with the girls.[3] These components—which we shall call the "adoptive family assessment"—covered the content designated in items (2), (3), and (4) in the preceding paragraph.

---

[3] These components are "Children's Attitude Toward Placement and Adoption," "Preliminary Assessment of Eligibility and Commitment of Potential Adoptive Parent," "Relationship of the Children to the Identified Prospective Adoptive Parents," and "Analysis of the Likelihood of Adoption" (collectively, adoptive family assessment) and reflect content required by law. (See §§ 366.21, subd. (i)(1)(D), (E) & (G), 366.22, subd. (c)(1)(D), (E) & (F).)

**B.** *Any Arguments Based Solely on Omissions from or Deficiencies in the Section 366.26 Report Have Been Forfeited*

Parents specifically complain of omissions of information statutorily required to be included in the adoptive family assessment and generally criticize the thoroughness of the Department's investigation of Shawn and her partner as potential adoptive parents. They claim the adoptive family assessment "omitted essential information," thereby depriving the court of substantial evidence for its findings of adoptability. Because section 366.26 reports are "designed to make sure the court has the evidence before it to make the necessary findings at each stage of the proceeding" (*B.D.*, *supra*, 35 Cal.App.5th at p. 821), the parents conclude the juvenile court did not have "sufficient evidence" before it to find Mary and Aurora adoptable.

To the extent parents base their argument on the omission from the report of statutorily required information, they have forfeited their claim by failing to assert it in the juvenile court. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–412.) They rely on *In re Brian P.* (2002) 99 Cal.App.4th 616 to argue they did not waive their rights to contest the sufficiency of the section 366.26 report. *Brian P.* held that challenges to defects in the section 366.26 report may be waived, while the sufficiency of the evidence of adoptability may not. (*Id.* at pp. 622–623.) Thus, while the parents may question whether substantial evidence supports the juvenile court's findings of adoptability, by failing to object in juvenile court they have forfeited any challenge to specific defects in the report, such as omission of required content or insufficient discussion of required topics.

We do not say such omissions or deficiencies count for nothing. " 'Deficiencies in an assessment report . . . go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights.' " (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 14,

8

quoting *In re Crystal J., supra*, 12 Cal.App.4th at p. 413.) But we consider the evidence in the whole record in determining whether substantial evidence supports the termination of parental rights, and specifically the finding of adoptability. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Brittany H.* (1988) 198 Cal.App.3d 533, 549.) The defects in the section 366.26 report in this case were not egregious, and will not by themselves support reversal.

## C. *Parents' Contentions*

Mother claims there was no substantial evidence to support the juvenile court's finding of general or specific adoptability, and Father joins in her arguments.[4] Parents claim Mary and Aurora are not generally adoptable because they have too many medical and behavioral issues. Parents also argue the girls are not specifically adoptable because Shawn and her partner have not been sufficiently vetted.

The first of these claims implicates the Department's "evaluation of the child's medical, developmental, scholastic, mental, and emotional status" (§§ 366.21, subd. (i)(1)(C)(i), 366.22, subd. (c)(1)(C)(i)), and the second implicates the Department's "preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent" (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D)). On the first point, the parents do not complain that the section 366.26 report failed to contain an evaluation of the children's status; rather, they complain about the weight given (or not given) by the juvenile court to the children's identified problem areas. On the

---

[4] Father filed a separate opening brief, including an integrated statement of facts and procedure, but he joins in Mother's arguments in lieu of briefing his own. When we describe a position taken by Mother in the appeal, it reflects Father's position as well.

second point, they claim the discussion in the adoptive family assessment was missing or insufficient.

### D. *Substantial Evidence Supports the Findings that the Children Were "Likely To Be Adopted," or Were "Generally Adoptable"*

The court was not required to find the children "generally" or "specifically" adoptable.[5] (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) It was required only to find by clear and convincing evidence that the children were "likely" to be adopted within a reasonable time (*ibid.*; *In re K.B.* (2009) 173 Cal.App.4th 1275, 1292; *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561–1562; § 366.26, subd. (c)(1)), which it did. Parents contend the girls' significant medical and behavioral issues should have prevented such a finding.

In 2016, during the first dependency, Mary was diagnosed with fetal alcohol spectrum disorder, but her development improved while in foster care. She came into the current dependency with "global delays," needing "speech therapy and a behavioral specialist." At the six-month review, the social worker did report that Mary, then three years old, displayed "significant" behavioral issues, such as throwing tantrums, behaving aggressively with others, and self-harming by biting herself and banging her head. In that same time period, the court-appointed special advocate (CASA) for Mary filed a report in which she repeated Shawn's claim that, after seeing

---

[5] There are unusual cases where a child, due to severe physical or mental needs, may be deemed adoptable based solely on the fact that a particular family wants to adopt the child (specific adoptability). (See *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1058, 1061.) In those circumstances, instead of focusing on the child's characteristics, the court must determine whether there is a legal impediment to adoption. (*Id.* at p. 1061; *In re J.W.* (2018) 26 Cal.App.5th 263, 267–268.) The present case is not one involving specific adoptability.

her birth parents, Mary reverted to infantile behavior, such as wanting to wear diapers or suck on a pacifier. Mary was nearsighted and had ophthalmologic needs. She sometimes had encopresis and enuresis and at least once engaged in scatolia (fecal smearing). She had a chronic rash. She was scheduled to undergo genetic testing. Because she walked on her tip toes, she had also been referred for orthopedic care. Mary participated weekly in individual therapy and parent-child interaction therapy (which helped Shawn develop strategies for coping with Mary's challenging behaviors). A pediatrician recommended a special education preschool for her due to behavior issues and global delays but the parents declined to enroll her.

Aurora "progressed significantly" during the first two months of foster care. Still, the CASA reported at the six-month review that Aurora did not walk until she was 15 months old, was not stable on her feet, choked easily, and did not vocalize at 17 months. By the time parental rights were terminated, Aurora, according to her parents, had "global developmental delays, vision problems, facial twitching, choking, hand flapping, daily tantrums, aggression to herself and others, obsessive behaviors, and she was being watched as potentially on the autism scale," but was considered too young to diagnose. Aurora was "scheduled for genetic testing in the summer of 2019." She also walked on her toes and had some anxiety and tantrums, but did well with structure.

Mother and Father contend these physical, behavioral and emotional difficulties should have made their daughters ineligible for a finding of adoptability. Our review is for substantial evidence to support the court's findings, by clear and convincing evidence, that Mary and Aurora are " 'likely to be adopted' " within a reasonable time (*In re J.W.*, *supra,* 26 Cal.App.5th at

11

p. 267; *In re Gregory A.*, *supra*, 126 Cal.App.4th at pp. 1561–1562), which is a "low threshold." (*In re K.B.*, *supra*, 173 Cal.App.4th at p. 1292.)

"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650, italics omitted (*Sarah M.*); see also *In re K.B.*, *supra*, 173 Cal.App.4th at p. 1293 [" '[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established. In such a case, the literal language of the statute is satisfied, because "it is likely" that that particular child will be adopted' "].)

Mother disputes this point, citing cases in which an appellate court has reversed a termination of parental rights for insufficient evidence based on deficient evidence of adoptability in the section 366.26 report. *In re Asia L.* (2003) 107 Cal.App.4th 498 involved two extremely hyperactive children who needed "specialized placement," where a prospective adoptive family had not been identified. (*Id.* at p. 511.) *In re Jerome D.* (2000) 84 Cal.App.4th 1200 involved a child with a prosthetic eye whose prospective adoptive parent had a criminal history of domestic violence and was listed as a perpetrator by Child Protective Services for emotionally abusing his nephews and niece. (*Id.* at p. 1203.) The case also involved the beneficial parental relationship exception to termination of parental rights, where the child's attorney agreed

12

with the mother that parental rights should not be terminated. (*Id*. at pp. 1206–1207.) Neither case supports an argument that unobjected-to deficiencies in the section 366.26 report may routinely be grounds for reversing a finding of adoptability.

*In re Valerie W., supra*, 162 Cal.App.4th 1 involved one child who was "emotionally fragile," whose "behaviors were deteriorating" (*id*. at p. 10), and a sibling who had yet to undergo testing for a serious neurological or genetic disorder (*id*. at pp. 6, 10). The prospective adoptive parent was the foster mother, who wanted to adopt the children jointly with her adult daughter. (*Id*. at p. 4.) It was not even clear whether such an adoption would be legal, and none of the information required in the section 366.26 report had been provided for the adult daughter. (*Id*. at pp. 7–8, 10–11, 13–16.) We believe it was the combination of the children's difficulty in being placed, the one sibling's unsettled health status, plus the request for an unusual form of joint adoption, that convinced the court to reverse. Parents fail to persuade us that the alleged omissions or deficiencies in the section 366.26 report in this case will, by themselves, justify reversal of the adoptability findings or the termination of parental rights.

Finally, Mother argues the opinion of the social worker that the children were adoptable is not alone sufficient to constitute substantial evidence of adoptability. (*In re Brian P., supra*, 99 Cal.App.4th at p. 624; *In re Kristin W.* (1990) 222 Cal.App.3d 234, 253.) The social worker opined that the children were adoptable, despite their medical and behavioral issues, because they were "young, sweet and engaging children." Mother uses this one sentence as evidence that the judge based his decisions on the social worker's opinion alone.

There is no reason to suspect the judge made the findings of adoptability based solely on the social worker's opinion. On the contrary, Judge Lawrence Ornell had presided over the family's two dependency cases for almost three years and had a wealth of information about these children. The presence of a foster-adoptive family was evidence of adoptability. (*Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649–1650; see also *In re K.B.*, *supra*, 173 Cal.App.4th at p. 1293.) The fact that Brother, who had more severe health problems, had been adopted was evidence of adoptability. The fact that the two little girls could form loving, trusting relationships with Shawn was evidence of adoptability. To suggest there was nothing in the record but the opinion of a social worker to support the judge's findings of adoptability is to ignore the evidence of the children's positive qualities and their close bonding with the prospective adoptive family, which speak volumes about their adoptability.

**E.** ***Any Suggestion that Shawn D. Does Not Understand the Responsibilities of Adoption Is Speculative***

A section 366.26 report's "preliminary assessment" of the "identified prospective adoptive parent," must include discussion of his or her "understanding of the legal and financial rights and responsibilities of adoption and guardianship." (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D).) The section 366.26 report in this case contained a general evaluation of Shawn as a prospective adoptive parent, but did not specifically recite her understanding of the responsibilities of adoption. Mother seeks to use this absence of information to suggest that Shawn lacks an appreciation of all she would be taking on by adopting Mary and Aurora. This, too, Mother claims as a basis for attacking the judge's adoptability findings and ultimately the termination of parental rights.

14

Mother's challenge, besides being forfeited (see *ante*, part II.B.), is far off-the-mark. Her supporting evidence is all but nonexistent. The adoptive family assessment noted that Shawn demonstrated good parenting practices and had the capacity to meet the children's needs. She provided a safe, secure and comfortable routine in a warm, child-friendly home. Shawn and the other family members gave the two girls an "abundance of love and positive regard" and encouraged their educational, recreational, and social opportunities.

Shawn had been caring for these two children for 17 months when the court terminated parental rights. We cannot credit Mother's speculation that Shawn might not realize what responsibilities she would be undertaking in adopting them. There is every indication in the record that Shawn knows exactly what is required to care for the girls and is up to the task.

Mother points out that, at the time the section 366.26 report was filed, Shawn was requesting continuing behavioral health services for Mary, and the Department was looking into arranging for such services in Lake County. Because Shawn used to work in early child development but was no longer employed, Mother also asks us to infer that she was "not bringing in income." Mother uses these two bits of information to construct a theory that Shawn is ill-equipped, emotionally and financially, to handle Mary and Aurora on her own, without government help. The implication is that she is a poor choice as an adoptive parent. Yet, Mother argues, the children are at risk of becoming "legal orphans" if the adoption does not go through, because no one else would want to adopt them due to their special needs.

We refuse to draw such negative conclusions or make such dire predictions based on Shawn's simple inquiry about available services. That she is proactive about seeking professional help for the children is to her

15

credit, and seeking government help when available is neither shameful nor disqualifying. We know of no requirement that a person must be prepared to go it entirely alone with a special-needs child before he or she may be eligible to adopt. And more importantly, such a consideration is irrelevant to whether the children are likely to be adopted. (See *Sarah M.*, *supra*, 22 Cal.App.4th at p. 1651; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844 (*Scott M.*).)

As for Shawn's financial preparedness, we presume official duty has been performed or will be performed as required by law. (Evid. Code, § 664.) We presume the social worker or the adoption social worker undertook or will undertake any necessary and appropriate financial inquiry. Parents have pointed to nothing in the record and presented no evidence to the contrary.

## F. *Suitability of the Prospective Adoptive Mother Is Not at Issue*

We emphasize that the statutory scheme requires only a "*preliminary* assessment of the eligibility and commitment of any identified prospective adoptive parent." (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D), italics added.) Parents here essentially challenge the *suitability* of the prospective adoptive family, which is not relevant at a section 366.26 hearing. In *Scott M.*, *supra*, 13 Cal.App.4th 839, the parents sought to inquire at a contested section 366.26 hearing whether the foster parents had appropriate childcare arrangements in place for times when the prospective adoptive mother planned to attend college classes, and whether the prospective adoptive family would receive special funding to care for the children. (*Id.* at pp. 842–843.) The trial court sustained relevancy objections, which the Court of Appeal upheld, holding that "a section 366.26 hearing does not provide a forum for the minors' parent to contest the 'suitability' of a prospective adoptive family." (*Id.* at p. 844.) The issue of suitability is reserved for the subsequent adoption proceeding. (*Ibid.*)

16

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'" (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) There being no requirement of a potential adoptive parent at all to establish general adoptability, parents correspondingly have no right to challenge Shawn's suitability (*id.* at pp. 1649–1650; *Scott M.*, *supra*, 13 Cal.App.4th at p. 844), for even if Shawn should prove to be unsuitable, the finding that Mary and Aurora are "likely to be adopted" incorporates a finding that another willing adoptive parent is likely to be found.

## G. *Shawn D.'s Partner Presumably Was Screened Before Foster Placement*

For the "prospective adoptive parent. . . , particularly the caretaker, . . . [a section 366.26 report must provide] a social history including screening for criminal records and prior referrals for child abuse or neglect . . . ." (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D).) Parents contend Shawn's partner had not been so screened. The statutes do not, on their face, require a screening of all members of the adoptive parent's household.

Moreover, since Shawn was also the foster mother, we may presume the required background and child welfare checks on her partner were performed before the children were placed in the foster home. California law requires all adults residing in a foster home to be screened for criminal history and prior child abuse referrals. (Cal. Code Regs., tit. 22, §§ 88019 [Criminal Record Clearance], 88019.2 [Child Abuse Central Index review].) Absent evidence to the contrary—and parents offer none—we presume the

appropriate public personnel ensured that the screens were performed. (Evid. Code, § 664.)

Mother relies extensively on *B.D.*, *supra*, 35 Cal.App.5th 803 in questioning the partner's safety with the children. Her aim is off-target. *B.D.* does not stand for the proposition that appellate courts should micromanage the preparation of section 366.26 reports. Though *B.D.* found an "incomplete" section 366.26 report so thoroughly undermined the evidentiary basis for the termination of parental rights that it constituted reversible error (*B.D.*, *supra*, at pp. 812, 821–824), parents whose rights have been terminated who then seek to attack the termination order by simply pointing to omissions in the section 366.26 report will find nothing in *B.D.*— properly read—to support that line of attack.

The holding of *B.D.* cannot be unmoored from its unique procedural posture. In *B.D.*, the birth parents, whose rights had been terminated, brought to this court's attention evidence that had not been produced to the juvenile court, revealing that the adoptive father's parental rights to his own children had been terminated years earlier, that he had served time in prison for a home-invasion burglary, and that he had recently been accused of physical abuse of B.D. and neglect of another child living in the adoptive home. He also allowed his adult son and his adult nephew to live in the house, though the son had been found to have committed sexual offenses against his peers as a juvenile and the nephew (who had been sexually abused as a child) was allowed to share a bedroom with eight-year-old B.D. (*B.D.*, *supra*, 35 Cal.App.5th at pp. 809–812.)

Unlike in *B.D.*, there is no evidence in this case of prior or current misconduct by Shawn's partner. *B.D.* involved what was either a gross oversight or unfortunate unwillingness to disclose full information to the

court. (*B.D.*, *supra*, 35 Cal.App.5th at pp. 811–813.)  There is no basis for believing the same kind of irregularity occurred here.  The facts in *B.D.* were so egregious that we took postjudgment evidence on appeal (*id.* at pp. 809, 815–818), another irregular aspect of the case.  In *B.D.* we reversed the order terminating parental rights because the omission of crucial information from the section 366.26 report (*id.* at pp. 821–824) put the child at risk and amounted to a violation of B.D.'s due process rights.  (*Id.* at pp. 810, 824–828.)  We do not perceive a similar situation here.

Parents here have alleged nothing even approaching the showing made by B.D.'s parents.  They cannot, merely by pointing to an omission in the section 366.26 report, gin up a case of reversible error.  Shawn and her partner had been co-parenting Mary and Aurora for 17 months before the section 366.26 hearing took place.  The partner was not completely unknown to the Department—or to the court—as Mother suggests.  If any concern had arisen about him during the dependency, one would expect to see it reflected in the periodic social workers' reports and in the section 366.26 report, and it is not.  (See *B.D.*, *supra*, 35 Cal.App.5th at p. 812.)

We see nothing in the record suggesting that Shawn's partner constitutes a threat to Mary or Aurora or that he puts the adoption at risk, and parents have offered no such evidence under Code of Civil Procedure section 909.  We are confident all of the matters about which they express concern will be thoroughly investigated in connection with the adoption.  (See Fam. Code, §§ 8712, subd. (c), 8730; Evid. Code, § 664.)  These are not matters of consequence to the adoptability finding at a hearing under section 366.26.  (*Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1648–1651; *Scott M.*, *supra*, 13 Cal.App.4th at p. 844.)

**H. *Father's Appeal in A157256 Must Be Dismissed as Abandoned***

A hearing was held on April 2, 2019, on the Department's section 388 petition to terminate the parents' visitation with Mary. Mary's therapist testified to her opinion that visits with the parents were retraumatizing Mary. The therapist observed both aggression and regression in Mary, which she characterized as a symptom of post-traumatic stress disorder. The behaviors reportedly worsened before and after visits with her parents. The court terminated parental visitation with Mary after the hearing.

On May 9, 2019, Father filed a notice of appeal (A157256) specifying that he was appealing from the April 2, 2019 order terminating visitation with Mary. Parental rights were not terminated until May 24, 2019. Father also filed a notice of appeal (A157444) on June 10, 2019, challenging the termination of parental rights.

In October 2019, we consolidated the two appeals at Father's request. Father filed a separate opening brief in the consolidated appeal, which included a full statement of facts and procedure, but simply joined in Mother's arguments in lieu of briefing his own. He indicated he was challenging the order terminating parental rights and did not raise any arguments concerning the order terminating visitation. Likewise, he filed a letter in lieu of a reply brief, simply joining in Mother's reply.

When an appellant's briefs fail "to make any arguments to support any theory of error," but there is no basis to conclude the appeal is frivolous, the appeal is deemed abandoned. (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1120.) "In this circumstance, dismissal of the appeal, with no consideration on the merits as to the correctness of the judgment or order from which the appeal is taken, is the proper disposition." (*Ibid*.)

20

### III.  DISPOSITION

In appeal A157444, the orders of the juvenile court on May 24, 2019 are affirmed.  Father's appeal in A157256 is dismissed.

STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.

A157256 / A157444

*In re Mary C./Sonoma County Human Services Department v. J.C.*
*In re Mary C. et al./Sonoma County Human Services Department v. J.C. et al.*

Trial Court:             Sonoma County Superior Court
Nos. DEP-4910, DEP-5365

Trial Judge:             Hon. Lawrence E. Ornell

Counsel for Appellant J.C.:    Matthew I. Thue,
by appointment of the Court of Appeal
under the First District Appellate Project's
Independent Case System

Counsel for Appellant N.E.:    Linda S. Votaw,
by appointment of the Court of Appeal
under the First District Appellate Project's
Independent Case System

Counsel for Respondent:      Bruce D. Goldstein, County Counsel (Sonoma);
Amy S. Ackerson, Deputy County Counsel