Filed 10/9/24  In re Ta.B. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In Ta.B., a Person Coming Under the Juvenile Court Law. | B332892 |
| | (Los Angeles County Super. Ct. Nos.CK38987, CK38987I) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. T.P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

In a juvenile court case that has been pending for more than a decade, the trial court found the minor, Ta., adoptable and terminated the parental rights of Tiffany P. (mother) under Welfare and Institutions Code section 366.26.[1]  Mother appealed. She asserts that the juvenile court erred in finding Ta. adoptable because he has special needs.  We find no error in this finding.

Mother also asks us to consider evidence that after the section 366.26 hearing, Ta.'s planned adoption fell through.  We follow controlling Supreme Court authority and hold that we may not rely upon evidence of events occurring after the termination of mother's parental rights to reverse the juvenile court's ruling.

Finally, mother asserts that the inquiry under the Indian Child Welfare Act (ICWA) was insufficient.  We find no error and affirm the juvenile court's ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

The extensive facts of this case are summarized in several previous decisions: *In re T.P.* (Feb. 6, 2020, B297465) [nonpub. opn.], *In re T.P.* (Mar. 30, 2023, B313540) [nonpub opn.], and *In re T.P.* (Dec. 1, 2023, No. B322047) [nonpub. opn.].  In the sections below, we summarize the evidence relevant to mother's appeal, focusing on Ta.'s history.  A separate section in the

---

[1]     All undesignated section references are to the Welfare and Institutions Code.

2

Discussion portion below summarizes the evidence relating to mother's ICWA contentions.

## A.    2012-2019

Ta., born in February 2010 and the youngest of mother's nine children, came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in April 2012. Ta. and several siblings, including Te. (born in 2009) and M. (born in 2006), were removed from mother's care in 2012. Mother pled no contest to certain allegations in the section 300 petition in June 2012, and mother's reunification services were terminated in 2014. The dependency proceeding has remained active since then.

In 2013, Te. and Ta. were placed with caregivers who became their legal guardians in 2016. Ta. had been diagnosed with autism spectrum disorder and had behavioral problems, including defiance, aggression, and tantrums that involved dangerous behavior. For example, a status review report filed on March 8, 2019 stated that Ta., then age nine, would try to take off his seat belt and jump out of the car while it was moving.

On April 17, 2019, Te. and Ta.'s legal guardians informed DCFS that they were no longer able to care for Ta. and they wanted to dissolve the guardianship for him. The guardians said that Ta.'s behavior was escalating, "[c]ulminating in several incidents during the month of April 2019 when [Ta.] hit Mrs. [Br., the legal guardian] in the eye, hit[,] bit and kicked his therapist and broke a large glass frame off the wall which placed the minors in Mrs. [Br.'s] daycare at risk of harm. Legal Guardians stated that the final straw was when [Ta.] threw a chair across the garage. Legal Guardians stated that they were concerned with the increasing level of violence by [Ta.] and were

3

concerned that they were not getting adequate help in dealing with his behaviors."  The juvenile court terminated legal guardianship for Ta. on July 1, 2019.[2]

**B.      2019-2021**

The change began a long succession of placements for Ta., who was removed from various foster homes after violent outbursts.  One replacement occurred in August 2019, for example, after Ta., age nine, had a tantrum in which he kicked his school's principal.  Then, after being placed in the caregiver's car, Ta. "laid on his back in the backseat of the car and began kicking the roof of the car and windows."  The caregiver asked that Ta. be replaced.

A caregiver in October 2019 noted that the difficult behaviors of Ta. included "being physically assaultive to the caregiver as well as to the others in the home, destroying property, kicking, spitting, kicking holes in the screen door, attempting to break the front picture window in the home with the nozzle of the water hose, destroying items in the home, yelling[,] screaming, using profanity, running away from the caregiver in public settings, hanging his body out of the car while the car was in motion, destroying property in Target Department Store, defiance, refusing to get dressed for school, refusing to either get in or get out of the caregivers [*sic*] car, refusing to go to class at school, running around the school hiding from the school staff, throwing chairs in the classroom and refusing redirection, hitting, kicking and biting the school principal.  During his stay in the caregiver's home, the child also made false allegations of

---

[2]      The guardians later also dissolved their guardianship over Te.

4

abuse." Twice in late 2019, Ta. was admitted to the hospital on section 5585 holds.[3]

Another caregiver, with whom Ta. stayed for 24 days from December 2019 to January 2020, had to request help from law enforcement and the psychiatric emergency team. In addition to breaking things, pulling things out of the kitchen cabinets, and threatening to cut the caregiver with broken glass, Ta. "was playing with the burners on the kitchen stove turning the fire off and on, and he was also using profanity, telling her to 'suck his dick.'"

A status review report filed on January 17, 2020 stated that Ta. had been in 12 placements in total. One caregiver in 2020 noted that Ta. "demonstrated aggressive behavioral outburst[s] at home and school," including incidents in which Ta. "would [throw] objects and hit others in the home when he became upset." Ta. had been prescribed various psychotropic medications and was receiving therapy. Ta. was placed on a waiting list for an intensive services foster care (ISFC) placement. At the January 21, 2020 permanency planning review hearing and at similar hearings thereafter, the court found that "[t]he [p]ermanent plan of adoption as a specific goal is appropriate and is ordered as the permanent plan."

A section 366.26 hearing report filed on February 19, 2021 stated that Ta. had been in 15 placements. At this time Ta. was with the C. family, who was interested in adopting mother's three

---

[3] The Children's Civil Commitment and Mental Health Treatment Act of 1988 (§ 5585 et seq.) provides that a minor who, "as a result of mental disorder, is a danger to others, or to himself or herself," may be taken into temporary custody for evaluation and treatment. (§ 5585.50, subd. (a).)

youngest sons, M., Te., and Ta.  In February 2021, the juvenile court designated Mrs. C. the holder of Ta.'s educational and developmental rights.  Ta. continued to have outbursts in which he "would throw objects, destroy furniture, break doors, and he hits others in the home when upset."  In July 2021, the C. family asked that Ta. be replaced after an incident in which Ta. "became physically aggressive toward Mrs. [C.], sibling [M.], and the family's dog.  The front door was broken and wood floor was damaged.  Mrs. [C.]  does not feel that she can safely manage [Ta.'s] behavioral outbursts combined with his significant special needs."  DCFS requested additional time to "to address the impediments to moving forward with a permanent plan."

A status review report filed on October 6, 2021 stated that Ta. was with a new caregiver, Ms. T., and he remained on the waiting list for an ISFC placement.  The report stated, "Since being placed with Ms. [T.], [Ta.] has been expelled from one childcare facility for spraying the staff and children with bleach and refusing to put down scissors.  The daycare staff and IFCCS[4] team were unable to convince [Ta.] to put the scissors down and law enforcement was called."  Ta. was hospitalized for an assessment, but was discharged because he did not present a danger to himself or others.

An addendum report filed on October 12, 2021 stated that Ta. remained on a waiting list for an ISFC placement.  He struggled with basic daily hygiene such as showering, brushing his teeth, and cleaning his ears.  On October 15, 2021, Ms. T., said she wanted to adopt Ta.  On November 2, 2021, the court set adoption as the permanent plan for Ta., and designated Ms. T. the holder of Ta.'s educational and developmental rights.

---

4        Intensive Field Capable Clinical Services.

However, Ms. T. gave notice to have Ta. removed, and on December 22, 2021, Ta. was placed in an ISFC home. The court designated the ISFC caregiver the holders of Ta.'s developmental and educational rights.

## C. 2022

In January 2022, upon mother's request, the juvenile court appointed a court-appointed special advocate (CASA) for Ta. An addendum report filed April 5, 2022 stated that the ISFC caregiver's goal was "to provide [Ta.] with love, care and support, so that he can stabilize and move on to a lower level of care, ideally a permanent home. She is not interested in providing permanency at this time, but is willing to support adoption recruitment efforts." A status review report filed April 13, 2022 stated that Ta. continued to struggle in school with "completing school work, staying focused, and running out of the classroom and school campus," and he had been assigned a 1:1 aide at school. At home with his caregivers, Ta. continued to struggle with "self-regulation. transitioning from one activity to another[, h]yperactivity, sensory issues, and basic hygiene." DCFS stated that there was no caregiver for Ta. willing to provide permanency, but DCFS was looking for a match. DCFS stated that it "believes [Ta.] is in need of a permanent home with caregivers who specialize in children with special needs."

At a section 366.26 hearing on May 3, 2022, the court ordered no contact between mother and Ta. after mother directly contacted the children in violation of the court's order that mother's contact be monitored. Mother appealed this order and a November 2022 ruling in which the court denied mother's request to lift the no-contact order. We affirmed the rulings in *In re T.P., supra,* Dec. 1, 2023, No. B322047. We found that the no-contact

7

orders were warranted because mother often attempted to sabotage the children's stability and placements. (*Ibid.*) The section 366.26 hearing was continued.

A last-minute information filed on July 1, 2022 reported, "[Ta.] has significantly improved in behavior, so well that he is attending summer school and Karate Lessons. We may have a possible adoption match for [Ta.]." The addendum report stated that "[Ta.] has improved in all areas of behavior and functioning. His self-help skills, ability to follow a daily routine and ability to self-regulate when feeling emotionally overwhelmed or when faced with a limit set by an adult have all improved significantly. . . . [Ta.] also strongly expressed that he is happy in his placement, but still hoping to find an adoptive match family soon."

A CASA report filed on July 12, 2022 stated that Ta. "recently completed 6th grade and is in a special day program for core classes and general education physical education. An Individual Education Plan (IEP) meeting was held June 1, 2022. The educational team reviewed the extensive testing they performed and provided updated goals for [Ta.]. At the conclusion of the 2021/2022 school year, [Ta.] had improved in all classes with passing grades. Per the current IEP, [Ta.] qualifies for one-on-one support throughout the school day. [Ta.] is attending summer school as per his previous IEP. The school district is providing one-on-one support during the summer school program. Per educational testing, [Ta.] meets criteria for special education with a diagnosis of Specific Learning Disability and Other Health Impairment. He does not meet criteria for Autism Spectrum Disorder (ASD). Educational team reports that [Ta.] continues to elope throughout the day, however this has

decreased with the assistance of his one-on-one support. The Educational team will also provide an occupational therapy assessment once school resumes in the fall." Ta. was also "a client of Harbor Regional Center under the diagnosis of Attention Deficit and Hyperactivity Disorder (ADHD) and Autism Spectrum Disorder (ASD)." Ta.'s mental health team was "working with [Ta.] on improving social skills (setting boundaries, reducing impulsive behaviors, increasing expressive thoughts/feeling and self-awareness). He is making slow gains in all areas."

A notice of replacement report filed on October 4, 2022 stated that Ta. had "graduated" from his ISFC placement, and had been placed with a potential adoptive parent, Ms. F.O.—his 18th placement—after a period of visitation "to ease the transition." A status review report dated October 5, 2022 stated that "[d]uring this period of supervision," Ta.'s "mental health was stabilized," and he "was able to graduate from ISFC program to a lower level of care, . . . attend and complete summer school, participate in extracurricular activities, and had no major behavioral crisis in placement or school which warranted hospitalization. The Department strongly believes [Ta.] was able to accomplish all of the above as a result of a stabilized placement which allowed for supportive services to be put in place. In addition, [Ta.] was not triggered by contact with mother . . . ." DCFS stated that Ta. needed to be placed with Ms. F.O. for six consecutive months before adoption could move forward.

The status review report also stated that Ta., now age 12 and in seventh grade, had an IEP and a one-to-one aide. "The school staff continues to report that [Ta.] will run out of class when he is assigned [a] task he does not want to complete.

9

However, the school is able to de-escalate [Ta.] using the school staff and no longer reaches out to caregiver. At this time, [Ta.] is passing all subjects and continues to thrive academically."

A notice of replacement report filed on October 20, 2022 stated that Ta. had been removed from Ms. F.O.'s home and placed with Mr. M.—his 19th placement. An addendum report filed October 21, 2022 stated that after an incident in which Ta. refused to leave school and go home with her, Ms. F.O. wanted Ta. placed in a home where he would be "happy." Mr. M. was a potential adoptive parent; DCFS stated, "Once [Ta.] has been in the home for approximately 30 days, [the social worker] will assess if the placement is stable and verify whether [Ta.] and Mr. M. wish to move forward with a plan of adoption."

**D.    2023: Placement with the B. family**

A notice of replacement report filed on January 23, 2023 stated that Ta. had been moved to the B. family's home, where his older brothers, M. and Te., also lived. The notice stated that Ta. was moved "after the child expressed wanting to reside with siblings." A CASA report filed on January 30, 2023 stated that "regional center and wraparound services [were] in the process of being transferred and implemented" in the area local to the B. family. Ta. had been hospitalized once recently due to his behavior. Ta. reported that he was happy to be living with his brothers. On January 31, 2023, the juvenile court designated the B.s as the holder of Ta.'s developmental and educational rights along with the CASA.

An April 5, 2023 concurrent planning assessment update stated that the B. family was ready to move forward with adopting Ta., and Ta. wanted to be adopted by them. A status review report filed on April 5, 2023 stated that Ta. "must reside

10

with the caregivers for 6 consecutive months and Parental Rights must be terminated before moving forward with adoption." Ta. had a one-to-one aide in school, but he continued to struggle with "getting to class on time, running out of class, and taking extensive bathroom breaks. [Ta.] struggles with extensive bathroom breaks at home, school, and in the community and [the caregivers] believe he is masturbating." Ta. struggled to brush his teeth daily, and "struggle[d] with compulsive over eating, being untruthful, hygiene, completing tasks, and compulsive masturbation at home, school, and community settings," such that he would lock himself in a bathroom for 30 minutes to an hour at a time.

A CASA report filed on April 25, 2023 stated that Ta. continued having one-to-one individual support at school. His planned regional center services included "respite care for caregivers, CBEM (Creating Behavioral+Education Momentum), . . . Sexuality Training," and applied behavior analysis (ABA) therapy, but there were wait lists for some of these services. His medications and dosages were being monitored and adjusted. Ta. was happy in the B.s' home and wanted to be adopted by them.

A last-minute information filed on July 13, 2023 stated that Ta. was receiving regional care services, including CBEM meetings "to address sexual behavior, hygiene, and aggressive behavior." The B.s reported that Ta.'s behavioral outbursts had increased, "triggered by food, video games, and when natural consequences are implemented." The CBEM team was called for crisis support on May 31 and June 16, 2023. The B.s were "patient and understanding while working with [Ta.]. In addition, [Ta.] has adapted well to living with the caregivers and continues to express feeling a part of the family. During monthly home

11

calls, [Ta.] expresses feeling respected, loved, safe, happy, and wanting to be adopted by the caregivers." The B.s also wanted to move forward with adoption.

A CASA report filed on July 20, 2023 stated that Ta. had completed seventh grade. Ta. was receiving counseling services twice per week, and his psychiatrist adjusted the dosages and timing of some of Ta.'s medications "to curb the more difficult behaviors" Ta. was exhibiting in the afternoons. The B.s noted that Ta.'s "behavior at home has become increasingly more difficult." His "behavior is the most difficult at bedtime and he will become defiant and disrespectful. [Ta.] is triggered by many things, however mostly when not getting to have screen time, getting his Xbox taken away, brushing his teeth, showering, and bedtime transitions." Ta. had a psychiatric hospitalization in July 2023. Ta. continued to report that he wanted to be adopted by the B.s, and the B.s wanted to adopt Ta.

A status review report filed on October 2, 2023 reiterated Ta.'s behaviors and services. It stated, "[Ta.] continues to express frustration with having to participate in so many services, which has led to several crisis [*sic*]. Furthermore, the caregivers express frustration and feeling unsupported by service providers. The caregivers reported on several occasions CBEN [*sic*], Wraparound, and Community Integration Service providers were unable to deescalate, stating they could not assist during violent physical outbursts and encouraged caregivers to contact law enforcement. Additionally, CBEN [*sic*] and Community Integration Services providers informed caregivers being unable to move forward with services if violent outbursts continued. On one occasion, [Ta.] slammed a door on caregiver Mrs. B's hand, which resulted in a severe injury to caregiver's hand. Mrs. B.

reported having to miss several days of work due to behavioral crisis were [*sic*] two caregivers were needed because of the lack of support from service providers."

The status review report continued, "On another occasion, DCFS was contacted by Regional Center after Community Integration providers reported [Ta.] struggle[d] to get in provider's vehicle, tried to jump out of the moving vehicle, struggled to keep the seat belt on, kept kicking driver's seat, and tried to break the car window." "Additionally, the caregivers reported [Ta.] continues to struggle with masturbating during inappropriate times and locations. Therefore, [all] electronics and television has to be monitored by the caregivers. At this time, [Ta.] continues to struggle with discussing the matter as it continues to lead to a behavioral outburst which can quickly escalate."

Ta. had a psychiatric hospitalization on July 18, 2023, after an incident in which he "began to throw furniture, grabbed caregivers, acting as if he was going to hit, verbally assault[ed] caregivers and service providers, blamed caregivers for his behavior and aggression, and crossed the caregiver's safety boundaries. The caregivers were instructed by CBEN [*sic*] service provider to call law enforcement. The caregivers, CBEN [*sic*] service providers, and Law Enforcement were unable to de-escalate [Ta.] and he was tak[en] to Exodus Recovery at MLK by Law Enforcement where he was placed on s psychiatric hold as a danger to others." Ta.'s medications were adjusted after the incident, and his behaviors improved.

Ta. was in eighth grade. He was able to get ready for school on time, and was "able to transition to 6 different classes with the help of his 1:1 aid." The status review report stated,

13

"[Te.] and [Ta.] are adjusting well and are closer to permanency because of the No Contact Order with mother [ ], as mother's interactions with caregivers and minors have resulted in frequent placement changes for the minors. The minors have been in foster care for over 11 years, as a result of the mother's interference, which has prevented permanency for the minors. Additionally, the minors are placed together is a safe, stable, and loving home and are close to obtaining permanency." DCFS requested that the court order "permanency in the form of adoption" for Ta.

A CASA report filed on October 16, 2023 stated that Ta. continued doing well in school. The B.s felt that Ta.'s medications and services were supporting him well, although "there [were] occasions when [Ta.'s] behaviors interfere with his progress," and there were times when Ta. "knows what he should do . . . but cannot get himself to actually do it." An "update on adoptive planning" report filed on October 25, 2023 stated that the B.s were "fully committed to adopting" Ta., and "there are no impediments to the adoption." DCFS recommended that mother's parental rights be terminated.

E.    **Section 366.26 hearing**

At the section 366.26 hearing on October 26, 2023, mother's counsel stated that mother was "available by phone but does not wish to appear for this hearing." Ta.'s counsel argued that Ta. was adoptable and that he wanted to be adopted by the B.s. Ta.'s CASA agreed that "the placement he is in right now is the best for him." She noted that Ta. "is getting better with the medication he is on," and added, "I have seen tremendous growth in the two years I have been his CASA."

14

Mother, through her counsel, objected to the termination of parental rights based on the parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)  The court noted that mother "has demonstrated a practice of trying to undermine the placements" of the children and "trying to communicate with her children in unmonitored ways," and over the course of the case mother showed that "she does not have an ability to control her own behavior."  The juvenile court found that the parental relationship exception did not apply, stating that the termination of the parental relationship "would not be a detriment at all" to Ta., because mother's relationship with him was "a negative influence in his life."

The court stated that the B.s "are doing a wonderful job with these boys."  The court found by clear and convincing evidence that Ta. was adoptable, and that it was likely Ta. would be adopted.  The court terminated parental rights.  The court deemed the B.s prospective adoptive parents, and denied mother's renewed request for visitation.  Mother timely appealed the juvenile court's order.

## DISCUSSION

### A.    Adoptability

Mother contends the juvenile court erred by finding that Ta. was likely to be adopted. At a section 366.26 hearing, "[i]f the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.  The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."  (§ 366.26, subd. (c)(1).)  Thus, a

15

"juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citation.] The 'likely to be adopted' standard is a low threshold." (*In re J.W.* (2018) 26 Cal.App.5th 263, 266-267.)

"On review, '"we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]' [Citations.] We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming.'" (*In re J.W., supra*, 26 Cal.App.5th at p. 267; see also *Guardianship of O.B.* (2020) 9 Cal.5th 989, 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].)

1.    *Adoptability finding at the section 366.26 hearing*

Mother contends the juvenile court's order should be reversed because Ta.'s violent behaviors and emotional issues "belie a finding by clear and convincing evidence that he is likely to be adopted." She argues that the juvenile court erred when it "terminated parental rights based solely on [the B.s'] desire to adopt Ta. In light of the multiple placements necessitated by Ta.'s severe emotional and violent problems, and more recently, disturbing sexualized behaviors, there was no clear and convincing evidence Ta. was likely to be adopted within a

16

reasonable time." DCFS asserts that the juvenile court's ruling is supported by substantial evidence.

In general, special needs do not render a child unadoptable. (See, e.g., *In re J.W., supra*, 26 Cal.App.5th at p. 265 ["Children with special needs . . . may nonetheless be adoptable. Disability is not a bar to adoptability."]; *In re K.B.* (2009) 173 Cal.App.4th 1275, 1293 [rejecting the contention that "a special-needs child can be deemed adoptable only if an 'approved' prospective adoptive parent exists"].) However, a child's special needs may affect how a court assesses adoptability.

"[A]doptability generally falls into two categories: General adoptability, and specific adoptability. . . . A child who is happy, healthy and young, with no discernable developmental problems, can be found to be generally adoptable even if no prospective adoptive family is '"waiting in the wings,"' ready to adopt." (*In re B.D.* (2019) 35 Cal.App.5th 803, 817 (*B.D.*).) Specific adoptability may be found where a "minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650.) "For a specifically adoptable child," the juvenile court "must determine whether there are any legal impediments to adoption and whether there is a prospective adoptive parent who is able to meet the needs of the child." (*B.D., supra*, 35 Cal.App.5th at p. 817.) A juvenile court is "not required to find the [child] 'generally' or 'specifically' adoptable," rather, the court is "required only to find by clear and convincing evidence that the [child is] 'likely' to be adopted within a reasonable time." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802.)

17

There is no question that Ta. is a high-needs child. At the time of the section 366.26 hearing, 11 years into the active juvenile court case, Ta. was 13 years old and had been in foster care for most of his life. He had been diagnosed with ASD and ADHD, he was taking psychotropic medications, and was in intensive therapy. Ta.'s violent outbursts sometimes put himself and others at risk. Mother argues that because of Ta.'s special needs, "the decision to order adoption was based not on evidence that Ta. was adoptable, but that these particular caregivers wanted to adopt Ta." Mother asserts, "should the adoption fall through . . . there were no other identified adoptive families willing to adopt this child."

The juvenile court's focus on whether the B. family could meet Ta.'s needs was correct. In general, "the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) However, "[w]hen a child is deemed adoptable only because a particular care taker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether the he or she is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.) In assessing the adoptability of a high-needs child, "the assessment of the adoptability of [the] child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs, since if the prospective adoptive parents cannot meet the child's needs, the child cannot properly be found to be adoptable." (*In re Carl R., supra,* 128 Cal.App.4th at p. 1062.)

18

Here, the juvenile court correctly made that determination. The court considered how Ta. was doing in the B.s' care and whether the B.s were able to meet Ta.'s special needs. Mother does not argue otherwise. Mother also does not assert that there was any legal impediment to adoption. We therefore find no error in the juvenile court's finding that as of the section 366.26 hearing on October 26, 2023, Ta. was specifically adoptable.

2. *Consideration of post-hearing evidence*

In this court, mother filed a motion under Code of Civil Procedure section 909 asking us to consider evidence post-dating the section 366.26 hearing. The evidence consisted of three exhibits, as follows.

Exhibit 1, a last-minute information filed on November 15, 2023 stated that the B.s reported that Ta.'s "behaviors have reverted back to daily behavioral outbursts such [as] throwing objects, verbally assaulting caregivers and providers, trashing caregivers['] home, ditching classes, [being] verbally aggressive towards his 1:1 aid at school," and being verbally aggressive toward other service providers. The B.s were "frustrated" with failures of various support programs, such as a lack of any crisis response after 5:00 p.m. and a respite caregiver who left Ta. and Te. home alone, resulting in an altercation between the brothers during which police were called. The B.s were "concerned with minor [Te.] not wanting to be in the same room as [Ta.] and minor [M.] walking on egg shells [*sic*] to keep [Ta.] happy."

Exhibit 2, a notice of replacement report filed on January 22, 2024, stated that Ta. had been hospitalized on December 30, 2023, and the B.s asked that Ta. be placed in a new home thereafter. Ta. was then placed with a new caregiver.

19

Exhibit 3, a notice of replacement report filed on February 8, 2024, stated that Ta. was placed in a new foster home—his 22nd placement—after the previous caregiver requested that Ta. be removed from his care. The report stated that Ta. "destroyed the home, hit a female adult in the home, and refused to go to school which resulted in Law Enforcement being called to the home."

Mother asserts in her motion, "Due to the drastically changed circumstances for Ta. since the October [26], 2023, termination of parental rights," this court should consider the post-hearing evidence. DCFS opposed mother's motion.

In general, "'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 (*Zeth S.*).) However, Code of Civil Procedure section 909 allows a reviewing court to "make factual determinations contrary to or in addition to those made by the trial court," and, "for the purpose of making the factual determinations," the reviewing court may "take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal."

Our Supreme Court has cautioned against the consideration of postjudgment evidence in appeals following the termination of parental rights. In *Zeth S.*, the Supreme Court addressed this question: "in a juvenile dependency appeal from an order terminating parental rights, may the Court of Appeal receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment? The general answer is

20

no, although in the rare and compelling case an exception may be warranted." (*Zeth S., supra*, 31 Cal.4th at pp. 399-400.)

The *Zeth S.* court cautioned that the consideration of postjudgment evidence "effectively substitutes the reviewing court's own post hoc determination of whether termination of parental rights remains in the minor's best interests[ ] for the legislatively mandated determination that follows when the comprehensive juvenile dependency statutory scheme is dutifully adhered to in the trial court." (*Zeth S., supra*, 31 Cal.4th at pp. 409-410.) The court stated that if "postjudgment evidence of circumstances involving the minor's present out-of-home custody status during the pendency of the appeal [was] routinely and liberally considered," appeals would devolve into hearings in which "the reviewing court[ ] would be utilized to determine whether the juvenile court's judgment should be reversed and the case remanded for a new 366.26 hearing, even where the juvenile court itself has committed no legal error in terminating parental rights on the record evidence before it." (*Id*. at p. 412.) The court rejected such an approach: "[C]onsideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights . . . would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment." (*Id*. at p. 413.)

The Supreme Court has since reiterated this view. In *In re Josiah Z.* (2005) 36 Cal.4th 664, 676, for example, it noted that *Zeth S.* held that appellate courts should not use "new evidence outside the record to second-guess the trial court's resolution of

21

issues properly committed to it by the statutory scheme." In *In re Kenneth D.* (2024) 16 Cal. 5th 1087, the Supreme Court reaffirmed the holding of *Zeth S.* in finding that postjudgment ICWA evidence should not be considered by appellate courts.

However, *Zeth S.* stated in a footnote that one case, *In re Elise K.* (1982) 33 Cal.3d 138 (*Elise K.*), "serves as precedent for the proposition that where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment, an appellate court acts within its discretion in accepting such a stipulation and reversing the judgment." (*Zeth S., supra*, 31 Cal.4th at p. 414, fn. 11.) *Elise K.* has a very short majority opinion, stating only that the court found it appropriate to accept the parties' stipulation "that the judgment herein be reversed and the cause remanded to the trial court for further proceedings 'in light of subsequent material evidence concerning the adoptability of the subject minor.'" (*Elise K., supra*, 33 Cal.3d at p. 139.)

Justice Bird's concurrence in *Elise K.* includes the details of the case. The child, Elise, was removed from her mother's care at the age of five. The mother, who lived a very erratic and unstable life, sporadically attempted to reunify with Elise over the next several years. When Elise was 10, for example, the Department noted that she "was in need of a stable, permanent family with whom she could live," but due to her ongoing relationship with her mother, "it would be detrimental to Elise to completely sever her ties with her mother." (*Elise K., supra*, 33 Cal.3d at p. 144.) The trial court nevertheless found Elise adoptable and terminated the mother's parental rights.

Years later, however, as the mother's appeal was pending, Elise's adoption fell through. The concurrence states, "At oral argument, both sides urged the Court of Appeal to consider the post-judgment situation. Apparently, the Department told the court that Elise's age—then nearly 14 years old—made her no longer adoptable. Thus, Elise was without a family or the prospect of a family." (*Elise K., supra*, 33 Cal.3d at p. 145.) Justice Bird discussed the termination of parental rights and adoptability under the statutes effective at the time, and continued, "Elise has had a long and caring—if incomplete— relationship with her natural mother. This is a relationship which both parties wish to continue. . . . Under these circumstances, had the trial court been able to foresee that Elise would not be adopted, it surely would not, and could not, have ordered appellant's parental rights terminated. . . . Except where the natural parent abuses the child—a situation not presented by this appeal—an inadequate parent would appear to be preferable to no parent at all and would be more consistent with the overall legislative scheme." (*Id.* at pp. 148-149.) The concurrence stated that the postjudgment evidence should be considered under the circumstances: "The state took the drastic step of terminating Elise's relationship with her natural mother. This step was considered to be in Elise's best interest at that time. It was based in part on the reasonable premise that Elise could and would be provided with a more satisfactory parental relationship through adoption. For reasons unforeseeable at the time, the premise has turned out to be erroneous. Elise has not been adopted and is no longer adoptable.[ ] The basis for the section 232 order has been undermined." (*Id.* at pp. 150-151.)

23

Mother urges us to consider the postjudgment evidence under the reasoning of *Elise K.* and *B.D., supra*, 35 Cal.App.5th 803. In *B.D.*, after parental rights were terminated, it came to light that the child had been abused in the foster home, the foster father's parental rights to his biological children had been terminated, and the foster father had an extensive criminal history. (*B.D., supra*, 35 Cal.App.5th at pp 810-812.) In the Court of Appeal, the parties—including the child—"stipulated to reversal, jointly recognizing that, following the termination of parental rights, 'subsequent events [have] undermined the juvenile court's finding that [Minor] was likely to be adopted.'" (*B.D., supra*, 35 Cal.App.5th at p. 809.) The court found that the case was "one of those 'rare and compelling case[s]' . . . 'where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much[.]'" (*Id.* at p. 818, quoting *Zeth S., supra*, 31 Cal.4th at p. 399, 413, fn. 11.)

This case is not like *Elise K.* or *B.D.* First, DCFS has opposed mother's motion to consider postjudgment evidence; this is not a situation in which the parties have stipulated that the postjudgment evidence should be considered. (See *Zeth S., supra*, 31 Cal.4th at p. 414 [consideration of postjudgment evidence may be warranted when "all parties . . . express a willingness to stipulate to reversal of the juvenile court's judgment"].)

Second, this is not a case like *Elise K.*, in which the mother struggled with stability, but maintained a positive ongoing relationship with the child. Justice Bird noted in her concurrence in *Elise K.* that "[t]he testimony of several social workers at the hearings confirmed the 'affection,' the 'strong relationship, the ties,' and the 'warmth' existing between mother and daughter."

24

(*Elise K., supra*, 33 Cal.3d at p. 144.) Here, by contrast, when mother asserted the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), the juvenile court rejected her claim, noting that mother's relationship with Ta. was detrimental to him. Mother does not challenge that finding.

Third, the reasoning of *B.D.* also does not apply here. In *B.D.*, the court relied on *In re David H.* (1995) 33 Cal.App.4th 368 (*David H.*), a case in which parental rights were terminated; DCFS construed the child's prospective adoptive parents as providing the child a happy, stable home. In reality, the adoptive couple was divorcing, they had declared bankruptcy, and the father was alleged to be an abusive alcoholic. (*David H., supra*, 33 Cal.App.4th at p. 376.) The child's biological parents challenged the termination of parental rights, arguing that the ruling was obtained by fraud. (*Ibid*.) In rejecting this challenge, the Court of Appeal stated, "Parental rights are terminated because (1) the parents have been found so derelict in their duties to their children, or so unable to fulfill those duties, that it would be harmful to return the child to their custody (§ 366.21(e); § 366.22(a)), and (2) the child has a chance of finding a caring, stable and nurturing home elsewhere (§ 366.26(c).) In David's case, he was freed from inadequate parents, but his prospective adoptive home proved to be a mirage and a hoax. It would be a tragic anomaly if the derelict parents could now further impede David's chances of finding a secure home by forcing relitigation of the permanent plan on the ground of injuries they feel were done to them. [¶] As a general matter, it would be inimical to the policies underlying the juvenile court law to allow parents to raise a collateral challenge to an order terminating parental rights on the ground that the child's posttermination placement

did not meet with the parents' expectations.  Such relief is not available, whether the parents' expectations were not met because of an uncontrollable turn of fate, [citation] or for any other reason. . . ." (*Id*. at pp. 384-385.)

The *B.D.* court quoted this portion of the *David H.* opinion, and stated that "[w]ith respect to Parents, the analysis in *David H.* is apt." (*B.D., supra*, 35 Cal.App.5th at p. 826.)  The *B.D.* court held that the child himself, however, had a "fundamental liberty interest in accurate determination of the issue of adoptability on a full and complete record," and considered the postjudgment evidence on that basis.  (*Ibid*.)

Here, Ta. has not appealed. Mother proposes that we consider the postjudgment evidence as a means of reinstating her parental rights; otherwise, she argues, Ta. will be a "legal orphan."  However, even before mother's parental rights were terminated, Ta. was essentially a legal orphan. Ta. has not been in mother's custody since he was two years old. Mother has not held Ta.'s educational or developmental rights for more than a decade.  The juvenile court has ordered, and we have affirmed, an ongoing no-contact order because mother's interactions with her children were detrimental to their safety and security.  For years, mother has not asserted any arguments supporting Ta. or his well-being; instead, she asserts only her own interests, such as repeatedly asking the juvenile court to lift the no-contact order despite clear findings that mother's contact was detrimental to the children.  Even now, on appeal, mother does not assert that reversal of the juvenile court's order would benefit Ta. in any way.

Fourth, Code of Civil Procedure section 909 allows an appellate court to "make factual determinations" on appeal "to

26

the end [that] causes may be finally disposed of by a single appeal and without further proceedings." Here, the additional evidence does not allow for judicial factfinding about Ta.'s current best interests. The only information available is that Ta.'s adoption with the B.s fell through, and he was replaced twice. We have no information about Ta.'s current circumstances, whether he is thriving in his new placement, or whether there is another caregiver currently willing to adopt Ta. On so thin a record, it would be inappropriate to substitute our judgment about Ta.'s adoptability for that of the juvenile court. Moreover, mother presents the evidence for the purpose of reversal and remand for further proceedings in the juvenile court, which contradicts Code of Civil Procedure section 909's stated purpose to minimize "further proceedings."

Thus, we find that this is not a "rare and compelling case" (*Zeth S., supra*, 31 Cal.4th at p. 399) in which postjudgment evidence should be relied upon to reverse the juvenile court's finding under section 366.26.

**B.  ICWA**

Mother also contends that DCFS's inquiry under ICWA was insufficient to meet the statutory requirements. DCFS disagrees, and contends the inquiry was sufficient.

1.    *Factual background*

On May 9, 2012, the juvenile court found that ICWA did not apply.[5] In orders on May 3, 2022 and July 21, 2022, the juvenile court ordered DCFS to interview extended family

---

[5]    This finding was based in part on mother's representation in earlier dependency cases that she had no Native American ancestry. Referrals and dependency court cases for mother's older children went back to the 1990s.

27

members about whether Ta. was an Indian child, and to provide any required notice to identified tribes.

A last-minute information filed on July 1, 2022 included ICWA updates for mother and Ta.'s father (father). It stated that father denied any Native American heritage and declined to provide any contact information for paternal relatives. Mother also denied Native American heritage, stating, "My father was an only child. He has passed. His parents have passed. My mother is an only child. She lives in Georgia. When you guys first started asking me about this, I talked to her and she didn't have any information regarding anything like this. Now she and I don't talk. We are estranged. Her parents are deceased. I don't have cousins and Aunts and Uncles to talk to. Everybody is dead. So the answer to your question is no we don't have any Indian heritage that we know of."

Months later, however, mother claimed to have Cherokee heritage. A status review report dated October 5, 2022 stated that mother reported she was adopted, and her biological mother was of Cherokee descent. DCFS stated, "However, [mother's] biological parents are [MGM] DOB: [redacted] and [MGF] DOB: [redacted]. According to the mother, [MGM] is of Cherokee decent [*sic*] but no [further] details are known as maternal great grandparents parents have passed away. The mother could not provide the name or dates of birth for maternal great grandparents or paternal great grandparents."[6] DCFS attempted to contact MGM, and sent ICWA notices to the Sacramento Area Director Bureau of Indian Affairs, the United States Department

---

[6] Presumably, DCFS was familiar with MGM because prior juvenile court cases terminated with three of mother's children in the custody of MGM as their legal guardian.

of the Interior, the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians of Oklahoma.

On March 23, 2023, MGM told DCFS that she did not have any Native American ancestry, and she did not know why mother told DCFS that she did. The Eastern Band of Cherokee Indians and the Cherokee Nation responded to DCFS, stating that Ta. was neither registered nor eligible to register for the tribes. Although DCFS sent a second notice to the United Keetoowah Band of Cherokee Indians of Oklahoma, the tribe apparently did not respond.

2.    *Analysis*

Mother contends that because "DCFS had consistent contact with maternal and paternal family members throughout the entire dependency proceedings," DCFS should have done more to determine whether Ta. had Native American heritage. Mother points to the following evidence: a maternal aunt was ruled out as a caregiver for the children in 2012 due to her criminal history, a paternal grandfather attended a court hearing in June 2013, Ta.'s brother M. lived with a paternal grandmother in Illinois before her death in 2019, and DCFS once spoke with a paternal aunt about the paternal grandmother's health in 2018. Mother argues that "in all these contacts with these family members, the social workers never inquired of any of them whether there was any Native American ancestry in the maternal or paternal family." She asserts that the matter "should be remanded for proper ICWA inquiry."

Section 224.2, subdivision (b) requires DCFS to "inquire whether [a dependent child] is an Indian child"; that inquiry "includes, but is not limited to, asking the child, parents, legal

29

guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child. . . ." (§ 224.2, subd. (b).) "Extended family members" include "the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

"A juvenile court's finding that ICWA does not apply in a proceeding implies that (a) neither the Department nor the court had a reason to know or believe the subject child is an Indian child; and (b) the Department fulfilled its duty of inquiry. [Citation.] "'"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance."'"" (*In re H.B.* (2023) 92 Cal.App.5th 711, 719.) "Appealing on the basis of ICWA or Cal-ICWA inquiry error . . . does not change the fact that parental rights have been terminated even if Indian ancestry is discovered." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1148, fn. 16.)

First, to the extent mother suggests that DCFS was required to comply with current ICWA standards in 2012, 2013, and 2018, we reject that contention. "In 2016, new federal regulations were adopted addressing ICWA compliance." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1130.) "After the federal ICWA regulations were adopted in 2016, California made conforming amendments to Cal-ICWA, including portions of the Welfare and

Institutions Code related to ICWA inquiry and notice requirements," which became effective on January 1, 2019. (*Id.* at p. 1131.) DCFS was not required to adhere to these amended inquiry requirements in its contacts with family members before 2019. Mother cannot rely on the newer standards to demonstrate error in older contacts with family members.

Second, after the juvenile court ordered additional ICWA inquiries in 2022, DCFS complied by expanding its initial inquiry and reporting the scope and results of its inquiry to the juvenile court. DCFS was not required to track down family members for whom mother and father did not provide contact information. "[S]ection 224.2, subdivision (b) does not require inquiry with every adult living extended family member." (*In re H.B.*, *supra*, 92 Cal.App.5th at p. 720.) "Where, as here, a parent largely fails to cooperate with DCFS or to provide names and contact information for extended family members, DCFS's ability to conduct an exhaustive ICWA inquiry necessarily is constrained." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082.) "[W]e cannot ask the agency to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided." (*Ibid.*)

The fact that DCFS considered a maternal aunt for a relative placement in 2012, a paternal grandfather attended a single hearing in 2013, and a paternal aunt in Illinois spoke to a social worker once in 2018 does not demonstrate that DCFS had the means to speak with these family members again in 2022. In 2022 father refused to provide contact information for his relatives, mother provided information only about MGM, and no evidence suggests that DCFS had ongoing contact with any additional family members. DCFS was not required to search out

31

additional family members to inquire about whether Ta. might be an Indian child. (See, e.g., *In re S.S.* (2023) 90 Cal.App.5th 694, 704-705 ("The Legislature's intent [in enacting the 2019 amendment] was that agency caseworkers ask an added question of extended family members whom caseworkers often already are investigating in their usual course of work"].)

Mother also asserts that the notice provided to the tribes was insufficient under section 224.3 because it included an incorrect date of birth for MGM[7] and placed MGF's information in the wrong box on the form. DCFS asserts that any error in the notices to tribes is irrelevant, because there was no "reason to know" Ta. was an Indian child, so the notice requirement under section 224.3 was never triggered.

DCFS is correct. The requirements of section 224.3 apply once DCFS or the juvenile court has a "reason to know" an Indian child is involved in a case. (See § 224.3, subd. (a)(1); *In re Dominic F.* (2020) 55 Cal.App.5th 558, 568; 25 U.S.C. § 1912(a).) "[T]here is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child is a member or eligible for membership in an Indian tribe, the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*In re Q.M.*, *supra*, 79 Cal.App.5th at p. 1084, citing § 224.2, subd. (d).) None of these six statutory criteria was met in this case. DCFS asked mother and father about these six criteria specifically, and they answered no to each of them.

---

[7] The notice mother references in the record appears to have the correct date of birth for MGM.

The only information provided about Ta.'s possible status as an Indian child was mother's claim that MGM had Cherokee heritage, which MGM denied. "A suggestion of Indian ancestry is not sufficient under ICWA or related California law to trigger the notice requirement." (*In re Dominic F.*, *supra*, 55 Cal.App.5th at p. 571.) Thus, mother has not demonstrated error under ICWA.

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P. J.

MORI, J.